## TEXAS PACIFIC COAL & OIL CO. v. BRUCE et al. (No. 9588.)

(Court of Civil Appeals of Texas. Fort Worth. April 16, 1921. Rehearing Denied June 4, 1921.)

**1. Wills ⟨⟩88(2)—Instrument held a deed and not a void will.**

Instrument executed by husband, designated a "deed," reciting that "I * * * have given, granted and conveyed, and by these presents, give, grant and convey," described land to the wife, that "it is my intention in making this conveyance," etc., and that, "This deed, however, under no condition or circumstances is to be made a matter of record or become absolute until after my death," *held* to convey a present estate to the wife to take effect on husband's death, under Vernon's Sayles' Ann. Civ. St. 1914, art. 1111, as against the contention that it was intended for a will, and was void for noncompliance with requirements as to execution under article 7857.

**2. Mines and minerals ⟨⟩73½—Oil held to have been "discovered" prior to certain date.**

Where oil well was shot about five weeks before a certain date with the result that oil arose some 150 feet in the hole, and where five or six days later the drillers put in a second shot, connected the well with the receiving tank, and on returning the next morning found some 30 to 50 barrels of oil in the tank, whereupon they commenced to clean out the well and remove the débris dislodged by the nitroglycerine, and where 150 barrels were saved prior to such date, oil had been "discovered" on such date within lease providing

for expiration on such date, unless oil had been "discovered" prior thereto.

.[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Discovered.]

**3. Mines and minerals ⚷⇒73½—Whether oil is being produced in paying quantities under lease is for exclusive determination of lessee acting in good faith.**

Where oil lease provided that the lease should continue in full force as long as oil was produced in "paying quantities," the question of whether oil is being produced in paying quantities is exclusively for the determination of the lessee, acting in good faith, and fraud in the exercise of such determination will not be presumed, but must be alleged and proven.

**4. Mines and minerals ⚷⇒73½—Well held to produce oil in "paying quantities" within a lease.**

Well, producing from 30 to 50 barrels of oil a day, though considerable time had been lost in cleaning out well and getting the pump to work satisfactorily, *held* to produce oil in "paying quantities" within lease providing for continuance thereof while oil is being produced in "paying quantities" (citing Words and Phrases, Paying Quantities).

**5. Deeds ⚷⇒56(7)—Husband held to have delivered to wife deed by which he conveyed land, to take effect on his death.**

Where husband handed to wife his deed, by which he had conveyed land to wife to take effect on his death, and told wife to read it, and later took the paper upstairs, and where on husband's death the deed was found in his trunk, there was a good delivery.

Appeal from District Court, Stephens County; W. R. Ely, Judge.

Action by E. P. Bruce and others against the Texas Pacific Coal & Oil Company and others. From judgment rendered, the named defendant appeals. Affirmed in part; reversed and rendered in part.

John Hancock and W. J. Oxford, both of Fort Worth, for appellant.

Levy & Evans, of Ranger, and McLean, Scott & McLean, of Fort Worth, for appellees.

BUCK, J. On May 28, 1913, P. J. Bruce, of Ranger, Tex., went to R. L. Weeks, notary public, and asked him to write a will. This the notary did, but when Bruce learned that the will would have to be witnessed, he asked the notary why he could not acknowledge it. The notary told him that he could prepare a deed conveying his property to his wife, Mrs. Jennie M. Bruce, to take effect at grantor's death, and did prepare the instrument hereinafter set out, which Bruce said was satisfactory, and duly acknowledged it. Bruce died October 21, 1913, and the wife had the instrument put on record in the deed records of Stephens county. This instrument, omitting formal parts and description

of the lands, consisting of 319 acres in Stephens county, reads as follows:

"Know all men by these presents that I, P. J. Bruce, of the county of Eastland, state of Texas, for and in consideration of the natural love and affection which I have and bear for my beloved wife, Jennie M. Bruce, have given, granted and conveyed unto the said Jennie M. Bruce. * * * [Here is a description of 319 acres of land in Stephens county.] It is my intention in making this conveyance to vest her, the said Jennie M. Bruce, with complete power to sell, rent, lease, transfer or use the property herein conveyed, in any shape or form that she may think best for her support and comfort, or the support, comfort or education of my children (by name), Elsie, Earl, Lloyd, Floyd, Olan and Vida Bruce. This deed, however, under no condition or circumstances is to be made a matter of record or become absolute until after my death."

Then follows the usual habendum clause, limiting and warranting the estate conveyed to Jennie M. Bruce and her heirs "of whom I am the father.".

After executing and acknowledging this conveyance, he took it home and presented it to his wife, and told her that here were "those papers," to "read them," and see the provision he had made for her and the children, if anything should happen to him. But she was busy with her household duties and did not read it. He took the paper upstairs, and it was found in his trunk after his death. Mrs. Bruce testified that her husband said at the time he presented the paper to her, "Of course, they are no good at all until after I am gone. Then it is yours."

On January 21, 1915, Mrs. Bruce, then a widow, executed an oil and other mineral lease to the Texas & Pacific Coal Company (subsequently changing its name to the Texas Pacific Coal & Oil Company) appellant here. This lease was for five years, and expired at midnight of January 21, 1920, unless it can be said that oil was "discovered" on the land prior to said time. If so discovered, then the lease was to "continue in full force and effect so long as any of these [named minerals] are produced in paying quantities."

Mrs. Bruce received the down payment of $79.25, and a like amount as annual rental thereafter for four years. On November 4, 1919, Earl P. Bruce, for himself and as next friend for Floyd, Olan, and Vida Bruce, minors, and Lloyd Bruce and Elsie Bruce Davis, joined by her husband, James Davis, filed suit against their mother, Mrs. Jennie M. Bruce, and the Texas Pacific Coal & Oil Company, the Quakins Petroleum Company, and Mrs. Sallie James, for the lands alleged to have been left to them by their deceased father, and alleged to have been the separate property of their deceased father, except as to 160 acres, the N. W. ¼ of survey No. 51, block 6, Texas & Pacific Railway Company

---

⚷⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

land, which they alleged was the community estate of their father and mother. They further alleged that the instrument left by their father was intended to be his last will and testament, though executed in form and manner similar in some respects to a deed. They further alleged that P. J. Bruce never delivered said instrument to any one before his death, and hence it was void as a deed, and was void as a will because not witnessed or otherwise executed in the form and manner required for a will.

The Texas Pacific Coal & Oil Company, hereinafter mentioned as Coal & Oil Company, and the Quakins Petroleum Company, answered by general demurrer, a plea of not guilty, and a general denial, and further pleaded that they were the owners of a lease for oil and other minerals on the land described in Stephens county, by a lease from Mrs. Bruce, the owner, and that they had discovered oil on said premises within the life of the lease, and had expended large sums of money in the drilling of a well and otherwise developing said land for oil, and that with full knowledge of said facts the plaintiffs had acquiesced in and encouraged the defendants to expend such large sums of money in such development.

Mrs. Jennie M. Bruce and Sallie James answered by a general denial and a plea of not guilty, and by special answer in the way of cross-action to the answer of the Coal & Oil Company and the Quakins Petroleum Company's special pleas denied that the last-named defendants' claims were made in good faith, and prayed for the cancellation of the lease. The cause was tried before a jury, and the jury answered the following special issues, to wit:

(1) That P. J. Bruce, in executing the instrument of May 28, 1913, did not intend it as a deed conveying his estate in said lands to commence after his death.

(2) That said instrument was delivered by P. J. Bruce, during his lifetime to Mrs. Jennie M. Bruce.

(3) That the defendants Coal & Oil Company and Quakins Petroleum Company were not producing oil in paying quantities on the land involved on January 22 (21?), 1920, at 12 o'clock midnight, or had they so produced same at any time within the five-year period of the lease.

(4) That 150 barrels of oil were produced on the lease in question before January 21, 1920.

(5) That 750 barrels were produced from the well on said premises subsequent to January 21, 1920.

(6) That the total cost to the defendant oil companies of the production of oil produced from the well prior to January 21, 1920, was $750.

(7) That the total cost of the oil produced from the well subsequent to January 21, 1920, was $3,000.

Upon this verdict, the court entered judgment canceling the lease made by Mrs. Bruce to the Coal & Oil Company, awarding Mrs. Bruce the one-half undivided interest in the northeast one-fourth of section No. 51, block No. 6, and a lifetime estate in one-third of the lands awarded to the plaintiffs. The judgment awarded to Mrs. Sallie James an undivided one-fortieth interest in the one-half interest of the 160 acres above described, and which the court found to be the community estate of P. J. Bruce and Jennie M. Bruce. All other lands involved were awarded to the children, share and share alike.

The two main questions in this appeal are, to wit: First, is the evidence sufficient to support the finding of the jury in answer to issue No. 1, that P. J. Bruce, in executing the instrument of May 28, 1913, did not intend the same to be a deed conveying his estate in said land to commence after his death; second, did the defendants the Coal & Oil Company and the Quakins Petroleum Company discover oil on the land in question prior to midnight, January 21, 1920?

Article 1111, V. S. Tex. Civ. Stats., provides:

"An estate or freehold or inheritance may be made to commence in futuro, by deed or conveyance, in like manner as by will."

In Ferguson v. Ferguson, 27 Tex. 339, 343, our Supreme Court quotes the following extract from 1 Williams on Executors, 87:

"The true principle to be deduced from the authorities appears to be that, if there is proof, either in the paper itself or from clear evidence dehors: First, that it was, the intention of the writer of the paper to convey the benefits by the instrument which would be conveyed by it if considered as a will; secondly, if death was the event that was to give effect to it; then, whatever may be its form, may be admitted to probate as testamentary. And there seems to be this distinction in the consideration of papers which are in their terms dispositive and those which are of an equivocal character, that the first will be entitled to probate, unless they are proved not to have been written animo testandi, whilst in the latter the animus must be proved by the party claiming under them."

Article 7857, V. S. Tex. Civ. Stats., provides:

"Every last will and testament, except where otherwise provided by law, shall be in writing and signed by the testator or by some other person by his direction and in his presence, and shall, if not wholly written by himself, be attested by two or more credible witnesses above the age of fourteen years, subscribing their names thereto in the presence of the testator."

[1] This instrument under consideration did not comply with the requirements of the statute with reference to the form and manner of executing a will. It was not written

by Bruce himself, but by the notary, and the failure to have the instrument witnessed by two witnesses, as provided by the statute, condemns it as a valid will, subject to probat. Moreover, Bruce himself in the instrument calls it a deed, and the instrument contains the usual and customary words of conveyance. The expressions "have given, granted and conveyed, and by these presents, give, grant and convey," and "it is my intention in making this conveyance," etc., evidence an intention on the part of the grantor to convey a present estate in the land, to commence, it is true, at his death. We do not think this plain and apparent intention is contradicted or made ambiguous by the statement in the conveyance that—

"This deed, however, under no condition or circumstances is to be made a matter of record or become absolute until after my death."

There is nothing in the instrument that reserves in the grantor the right or power to revoke, defeat or impair his act. In Crocker v. Smith, 94 Ala. 295, 10 South. 258, 16 L. R. A. 576, and quoted with approval by the Austin Court of Appeals in Eckert v. Stewart, 207 S. W. 317, the Alabama Supreme Court says:

"The intention of the maker is the ultimate object of inquiry—whether it was intended to be ambulatory and revocable, or to create rights and interests at the time of execution which are irrevocable. If the instrument cannot be revoked, defeated, or impaired by the act of the grantor, it is a deed; but if the estate, title, or interest is dependent on the death of the testator, if in him resides the unqualified power of revocation, it is a will."

As said by the appellants in their brief:

"No one dare insist that by the use of the phrase, 'when this deed shall become absolute,' to be found in vendor's lien deeds, no present estate is granted thereby, or that such instruments are testamentary."

See, also, Hart v. Rust, 46 Tex. 556; Rogers v. Kennard, 54 Tex. 30; Bombarger v. Morrow, 61 Tex. 417; Chavez v. Chavez (Sup.) 13 S. W. 1018; Jenkins v. Adcock, 5 Tex. Civ. App. 466, 27 S. W. 21; Chrisman v. Wyatt, 7 Tex. Civ. App. 40, 26 S. W. 759; Leslie v. McKinney, 38 S. W. 378, writ denied; Stevens v. Haile, 162 S. W. 1025; Emerson v. Pate, 165 S. W. 469; Low v. Low, 172 S. W. 590; Wright v. Giles, 60 Tex. Civ. App. 550, 129 S. W. 1163; Smith v. Smith, 200 S. W. 540.

We are forced to the conclusion that from the instrument itself it is apparent that it was the intention of the grantor to convey a present estate in the lands mentioned to his wife, but to take effect at his death, and that the trial court should have so instructed the jury. It becomes unnecessary to consider other assignments relating to this deed, and we will now direct our attention to the question of whether the cancellation of the lease from Mrs. Bruce to the Coal & Oil Company was justified.

[2, 3] The uncontradicted evidence shows that on December 15, 1919, the well on Mrs. Bruce's land reached 3,770 or 3,775 feet. That on the 17th of December it was shot. The result of the first shot was that oil rose some 150 feet in the hole. Some five or six days later, the drillers put a second shot, and before going home that night connected the well with the receiving tank. Returning the next morning, the workmen found some 30 to 50 barrels (the jury found 50 barrels) of oil had flowed out of the well into the tank. From that time until about three weeks of the trial below, in June, 1920, the workmen were occupied in cleaning out the well, removing the débris dislodged by the nitroglycerine. The record showed that 150 barrels of oil were saved up to January 20th. During this time and until the cleaning out of the well was completed, it flowed "by heads." The drillers had considerable trouble in removing the dislodged sand and rock, and even at the time of the trial they were having trouble with the pump, owing to the fact that the sand cut out the valves so they would not lift the oil. This condition required the rods to be pulled, and the putting in of new valves. The jury found that subsequent to January 21, 1920, 750 barrels were produced. Certainly, under this evidence, oil was "discovered" on the land within the life of the lease, and the lease provides "that in case natural gas, petroleum, etc., are discovered on said premises that this lease shall continue in full force and effect so long as any of these are produced in paying quantities." The testimony of F. J. Bates, superintendent, is that the cost of drilling the well and cleaning out of the well, such as swabbing or lifting out the débris, etc., is an expense chargeable to development, and is not chargeable to production or operation. The oil from the well was sold for $3.25 a barrel, and at the time of the trial the market price was $3.50 a barrel. As to whether oil was produced after its discovery in paying quantities is a question exclusively left to the determination of the lessee, acting in good faith, and fraud in the exercise of this determination will not be presumed, but must be alleged and proven. In Aycock v. Paraffine Oil Co., 210 S. W. 851, it is said:

"The following general definition of 'paying quantities' is given in Words and Phrases, vol. 6, p. 5247: 'The term "paying quantities," as used in an oil lease for a given term and as much longer as oil can be produced in paying quantities, means paying quantity to the lessee. If the well pays a profit, even small, over operating expenses, it produces in paying quantity, though it may never repay its cost, and the operation as a whole may result in a loss. The phrase "paying quantities," therefore, is to be construed with reference to the operator,

and by his judgment, when exercised in good faith.'"

In Thornton's Law of Oil & Gas (3d Ed.) § 149, p. 24, it is said:

"Upon discovery of oil and gas in paying quantities, the lessee acquires a vested interest in the oil and gas granted by the lease as long as it can be produced in paying quantities."

In section 148, page 232, of the same work, it says:

"A very common expression in oil and gas leases is that they are to continue so long as oil or gas is or can be produced in paying quantities. This is a clause for the benefit of the lessee; for it is obvious that a prudent man would not want to pay rent for premises after they had ceased to be productive; nor would he care to operate them, on even a royalty, where the operating expenses were more than the income. Occasionally the phrase might be of value to the lessor; for should the lessee occupy considerable surface of the ground leased, it might be of more value to him for other purposes than to have it continued for oil or gas purposes."

In Young v. Forest Oil Co., 194 Pa. 243, 45 Atl. 121, the Supreme Court of Pennsylvania says:

"But if a well, being down, pays a profit, even a small one, over the operating expenses, it is producing in 'paying quantities,' though it may never repay its costs, and the operation as a whole may result in loss."

In Colgan v. Forest Oil Co., 194 Pa. 234, 45 Atl. 119, 75 Am. St. Rep. 695, the following is said by the Supreme Court of Pennsylvania:

"The basis necessary to sustain the bill, therefore, is fraud, and that, of course, must be affirmatively and clearly proved. There is no relation of special trust or confidence between lessor and lessee in gas or oil leases, any more than in any other. Like all other contracting parties, they deal at arm's length, each for his own interest. So long as the question is one of business judgment and management, the lessee is not bound to work unprofitably to himself for the profit of the lessor; and the parties must be left, as in other cases, to their own ways. It is only when a manifestly fraudulent use of opportunities and control is shown that courts are authorized to interfere. * * *

"So long as the lessee is acting in good faith on business judgment, he is not bound to take any other party's [judgment], but may stand on his own. Every man who invests his money and labor in a business does it on the confidence he has in being able to conduct it in his own way. No court has any power to impose a different judgment on him, however erroneous it may deem his to be. Its right to interfere does not arise until it has been shown clearly that he is not acting in good faith on his business judgment, but fraudulently, with intent to obtain a dishonest advantage over the other party to the contract. Nor is the lessee bound, in case of difference of judgment, to surrender his lease, even pro tanto, and allow the lessor to experiment. Lessees who have bound themselves by covenants to develop a tract, and have entered and produced oil, have a vested estate in the land, which cannot be taken away on any mere difference of judgment. It is not within the jurisdiction of any court to oust the owner and forfeit the title to estates in that way, and the jurisdiction of equity to decree any specific act or declare forfeiture depends on fraud averred and fully proven."

In Thornton's Oil & Gas Law, p. 235, the following is said:

"It is for the operator, acting in good faith, to determine when the lease is no longer profitable; and the lessor cannot terminate it because it is not profitable to him to have it continue."

In Zeller v. Book, 28 Ohio Cir. Ct. R. 119, it is said that it is unnecessary for the lessee to show that he can get back from the operation of the wells the cost of drilling, since he is entitled to whatever salvage may be obtained from the operation, and so long as he is acting in good faith in making an effort to get some production out of the wells he has the right to decide for himself whether or not it is profitable.

Numerous other authorities might be cited in support of the rule that the stipulation that the lease shall continue so long as oil or gas is found in "paying quantities" is a stipulation for the benefit of the lessee, and that the lessee may in good faith exercise his judgment as to whether he shall continue operation or abandon the lease, but we think sufficient have been cited.

[4] Without attempting to quote the testimony, which we have carefully read, the evidence tends to show that the well has produced, under pump, from 30 to 50 barrels a day. It is true that the driller lost a good deal of time in cleaning out the well, and in getting the pump to work satisfactorily, but we believe the evidence establishes, without contradiction, facts which will support the good faith of the appellants in their claim that they are producing oil in paying quantities on the lease in question. In Ardizonne v. Archer (Okl.) 178 Pac. 263, it is held that the expenses necessarily incurred in the equipment of an oil well should not be taken into account in determining whether or not the production therefrom is in paying quantities. Lowther Oil Co. v. Miller-Sibley Oil Co., 53 W. Va. 501, 44 S. E. 433, 97 Am. St. Rep. 1027; Oil & Gas Rights by Morrison & De Soto, page 90, 91.

We conclude that the evidence fails to sustain plaintiff's theory that the instrument made by P. J. Bruce to his wife, Jennie M. Bruce, was not a conveyance of the present estate in the lands mentioned, and we hold that said Jennie M. Bruce had authority under this deed to lease the lands to the Texas Pacific Coal & Oil Company. We are

further of the opinion that the evidence is insufficient to support a judgment canceling said lease, but that the evidence before us requires us to render judgment for the defendants Coal & Oil Company and Quakins Petroleum Company upon this issue. No cross-assignment in the brief of Mrs. Jennie M. Bruce and Mrs. Sallie James is found complaining of the judgment of the trial court decreeing to, the children an interest in these lands; hence we will leave that part of the judgment undisturbed. But that part of the judgment canceling the lease is hereby reversed and here rendered for appellants, awarding them the leasehold interest in the lands described as given by the lease from Mrs. Bruce.

[5] The evidence sustains the findings of the jury that there was a delivery of the instrument to Mrs. Bruce by P. J. Bruce. Earl et al. v. Mundy, 227 S. W. 970; Brown v. Brown, 61 Tex. 56.

Reversed and rendered in part, undisturbed in part.