**SCARBOROUGH et al. v. NEW DOMAIN OIL & GAS CO. et al.　(No. 1728.)** *

(Court of Civil Appeals of Texas. El Paso. June 18, 1925. Rehearing Denied Oct. 15, 1925.)

1. **Mines and minerals ⬦75—Payment of rental under lease held not of itself to renew lease requiring production in paying quantities.**

Under lease for five years and as much longer as gas or oil should be produced in paying quantities, but, if gas only was produced, $100 per year was to be paid as long as gas was sold therefrom, the payment and acceptance of $100 did not of itself, apart from production of gas, extend lease for one year.

2. **Mines and minerals ⬦78(1)—Lease held to grant determinable fee, depending on continuance of production.**

Lease for five years and as much longer as gas or oil in paying quantities was produced gave lessee determinable fee, depending on continuance of production in paying quantities of minerals mentioned.

3. **Mines and minerals ⬦73—Lease not to be interpreted by ex parte oil field construction.**

Lease speaks for itself, and cannot be interpreted by ex parte oil field construction of its requirements or meaning.

4. **Mines and minerals ⬦78(2)—Lease terminated by cessation of production not revived by efforts to bring in other wells.**

Lease terminated by cessation of production is not revived by efforts of lessee and expenditure of money to bring in other wells.

5. **Mines and minerals ⬦78(2)—Evidence of temporary cessation of work and resumption within reasonable time held not to show forfeiture of lease.**

Under lease running for five years and as much longer as minerals named were produced in paying quantities, where production ceased unavoidably after five-year period, due to breakdown of well, and thereafter in good faith lessee made reasonable efforts to resume production, which was resumed within a reasonable time, temporary cessation of production did not subject lease to forfeiture; reasonable efforts to maintain production only being required.

6. **Mines and minerals ⬦78(2)—Lease not terminated by oil being discovered, but not produced within lease period, due to efforts to strike oil at lower level.**

Where lessee discovered, but did not produce, oil during life of lease, but drilled deeper after period of lease, with hope of getting greater production, and with intention of returning to previous level on failure, which was done, lease was not terminated on ground that oil in paying quantities was not produced within period of lease.

Appeal from District Court, Eastland County; Geo. L. Davenport, Judge.

Action by Willie L. Scarborough and others against the New Domain Oil & Gas Company and others. Judgment for defendants, and plaintiffs appeal. Reformed and affirmed.

J. R. Stubblefield, of Eastland, and J. G. McGrady, Geo. E. Wallace, and F. G. Morris, all of El Paso, for appellants.

Wynn & Roberson, B. F. Bouldin, and H. S. Garrett, all of Fort Worth, Coke & Coke, of Dallas, Butts & Wright, of Cisco, Scott W. Key and Conner & McRae, all of Eastland, and Y. A. Land, of Houston, for appellees.

WALTHALL, J. Willie L. Scarborough, Jess Scarborough, Moliere Scarborough, Chunk Scarborough, George E. Wallace, F. G. Morris and J. R. Stubblefield, appellants, filed this suit against E. J. Ward, New Domain Oil & Gas Company, a private corporation, T. R. Simmons, Robert F. Gilman, the copartnership of Gilman & Simmons, A. A. Cunningham, J. W. Leonard, Leonard Petroleum Company, a private corporation, Cosden Oil & Gas Company, a private corporation, Vortex Petroleum Company, a private corporation, Humble Oil & Refining Company, a private corporation, the Texas Company, a private corporation, appellees, to recover possession of certain lands described, consisting of some 2,840 acres of land in Eastland county, and all mineral rights therein named in a certain lease contract or sale to Herbert Lane, of date December 9, 1914, and for the value of the oil, gas, and gasoline taken from said land, or the prices at which same may have been sold by certain of appellees.

Appellants, in the alternative, should they not be allowed recovery for all of the oil taken from said land, sue to recover the value of one-half of the one-eighth royalty to which they may be entitled under said lease contract, if said lease contract remained in force; said mineral lease is pleaded by appellants, upon the express terms of which appellants base their right of recovery.

Appellants allege that the lessee, Herbert Lane, by reason of said mineral lease, acquired the title to said minerals named in the lease, subject to termination of such title or right to take said minerals after five years stated in the lease contract should expire, should the lessee, or those holding under him, fail to produce any of the minerals named in paying quantities.

Appellants allege, in substance, that on or about December 9, 1919, there was brought

---

⬦For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error dismissed for want of jurisdiction January 6, 1926.

in on said land a gas well which produced gas in paying quantities until March 23, 1920; that at that time said well ceased to produce gas; and that thereafter, until the 2d day of July, 1920, there was no production of any of the minerals named in said mineral lease; that on the 2d day of July a producing oil well was brought in on said land. Appellants allege that by reason of the above provision of said mineral contract and the failure of production on said land of oil, or gas, or any of said minerals, said mineral lease by its terms ceased and terminated.

Appellants further allege that the New Domain Oil & Gas Company had extracted large quantities of oil from said land, and that said oil had been appropriated by the Humble Oil & Gas Company.

E.·J. Ward pleaded not guilty, general denial, and special answer, setting up the execution as above of the said mineral lease; alleged a transfer of a mineral lease covering segregated portions of said land to various persons; that the Big Sandy Oil & Gas Company, an assignee of Herbert Lane, completed a well to a depth stated, by reason of which Herbert Lane and his assignees held a valid mineral lease on the land described to December 9, 1919; alleged a conveyance of the land in controversy by Willie L. Scarborough to him, E. J. Ward, with a reservation of one-half the royalty to the grantors, so long as oil or gas was produced under the said mineral lease; that on February 25, 1915, he, E. J. Ward, purchased from Willie L. Scarborough and others one-half of one-eighth royalty, which was reserved by said Scarboroughs in the making of the deed originally.

Ward also alleges that on December 9, 1919, a gas well was produced on said land, and that he was tendered $100 as an annual rental on the land; that he was the owner and holder of one-half of one-eighth royalty provided for under the said mineral lease between appellants Scarboroughs and others, and Herbert Lane, and that he is entitled to receive one-half of all royalties from oil and gas produced from said land, and that the lease is in force and effect.

Ward further alleged that appellants, during the month of January, 1920, gave notice to appellees that appellants regarded the mineral lease as no longer in force and effect.

The New Domain Oil & Gas Company alleged a misjoinder of parties; urged a general demurrer; pleaded not guilty, general denial; pleaded the making of said mineral lease sought to be canceled; alleged the bringing in of a gas well on December 6, 1919; pleaded the cessation of said gas well to produce gas during March, 1920; and alleged the efforts made to restore said gas well as a producing well; alleged the drilling of a well on said land by the New Do-

main Oil & Gas Company, in which oil was discovered; that said well produced some oil prior to July 2, 1920; that on July 2, 1920, the New Domain Oil & Gas Company shot said well, and·thereby developed a well producing oil, and that said well is still producing oil; alleged the expenditure by it of large sums of money in its effort to produce oil on said land; alleged that on January 3, 1920, and on May 20, 1920, appellants, by F. G. Morris, gave notice to appellee that appellants contended that said mineral lease by its terms had expired.

The New Domain Oil & Gas Company further alleged that it was common knowledge in the oil business that no attention is paid to the definite terms of an oil lease when the work of production is once under way, and that it is frequently the case that a single well which was producing on a lease beyond the definite term of said lease must be shut down, and the work of production of oil cease while necessary repairs to the rig are made; that by reason of said usage appellees had the right, even after the expiration of said mineral lease, under the terms· of same, not only to repair and try to restore a well which had ceased to produce, but to drill a second well in the vicinity of the first.

The Humble Oil & Refining Company alleged substantially the same facts as did the New Domain Oil & Gas Company, and, in addition, alleged the purchase from the New Domain Oil & Gas Company oil of the aggregate value of $53,011.87; the payment to Ward of one-half of one-eighth of same, aggregating the total sum of $3,291.04, and has now in its possession $3,311.43, the value of one-half of one-eighth of the oil taken by it from the said land, and that it is ready, able, and willing to make payment to such party as may be determined to be the owner, and made tender thereof, and it filed a cross-action against the New Domain Gas & Oil Company.

The other appellees, without specially setting out their several pleadings, adopted the pleadings, and, where not adopted, alleged, substantially, the same facts as did the New Domain Oil & Gas Company. They all denied that the lease had terminated, but insist that it was valid and subsisting; that they owned said lease, in so far as it affected certain portions of said land; and pleaded in detail reasons why said lease had not terminated, all similar in legal effect to the pleadings of appellees above set out.

The facts disclosed by the· record as .applied to each of appellees will be stated in the findings of fact, as far as we deem it necessary to state them.

The cause was tried to a jury, and the court peremptorily instructed the verdict in favor of appellees, and on which verdict judgment was rendered refusing to cancel said lease.

### Findings of Fact.

On December 9, 1914, Willie L. Scarborough, owner of the land in controversy, and Hilary Moseley, having a mortgage thereon, made an oil and gas mineral lease to Herbert Lane on 2,840 acres of land, describing same. The lease, so far as it becomes necessary to state its terms and provisions here, among other things, provided:

"Should a well be found producing gas only, then the lessor shall be paid for each such well the sum of $100 for each year so long as the gas is sold therefrom, payable quarterly while so marketed."

Also:

"Lessees agree to complete a well on said premises within one year from the date hereof, or pay Willie L. Scarborough, or her assignees, 25 cents an acre per annum, payable quarterly from the 9th day of December, 1915, until said well is completed or this lease is surrendered, which surrender is made complete and binding upon failure of this lessee to make such payment. And the drilling of such well shall be full consideration to lessor for grant hereby made to lessee with exclusive right to drill one or more additional wells on the premises during the existence of the lease."

Also, and what seems to present the controlling issue in the case, the following:

"To have and to hold unto and for the use of lessees for the term of five years from the date hereof, and as much longer as gas, oil, gold, silver, coal, lead or zinc is produced in paying quantities, yielding to the lessors, Willie Scarborough, or her assigns, one-eighth of all the oil produced and saved from the premises delivered free of expense into the tanks or pipe lines to the lessor's credit."

Also:

"It is further agreed that, upon the payment of $1, lessee shall have the right to surrender this lease, and thereafter shall be released and discharged from all payments, obligations, covenants, and conditions herein contained, whereupon this lease shall be null and void, and that all conditions, terms, and limitations between the parties hereto shall extend to their heirs, personal representatives, and assignees."

Herbert Lane assigned the lease to Big Sandy Oil & Development Company August 31, 1915. Big Sandy Oil, Gas & Development Company assigned the lease to T. K. Simmons October 8, 1918.

Assignments were thereafter made of the lessee's rights in and to certain parts of the property covered by said lease, including assignments to J. W. Leonard, R. F. Gilman, and others, among them an assignment dated April 10, 1919, from Simmons and Leonard to the New Domain Oil & Gas Company of 160 acres. No question is raised in the case as to the validity of the lease or of any of the assignments thereunder.

There has been some litigation growing out of the conveyance of the leased property to Ward, but, so far as we have observed, the litigation had and has no relevancy to any of the issues here, except, possibly, a temporary cessation from work for some twelve days in January, 1919. The lessee and his assigns by their operations on the leased property and payment of the rentals kept the lease in full force for the five-year term ending December 9, 1919. Before and at the end of the five-year term Gilman & Simmons had on said property a gas well which produced gas in paying quantities until on or about March 23, 1920. About March 23, 1920, the well was leaking water under the bottom of the casing. An effort was made to lift up the casing, underream the well, get a solid place to set the casing in order to shut off the water, and, while this was being done, the casing in the well collapsed down about 1,400 feet, and thereby bridged the well. "Fishing" was then commenced, and, so far as the evidence discloses, was continuously prosecuted in good faith in an effort to get the casing and tools below the collapsed casing. This "fishing" continued until October, 1920. From the evidence is seems to be not an unusual occurrence that casing collapses in a well.

When the Gilman & Simmons gas well got out of order in March, 1920, as above, the New Domain Oil & Gas Company was then putting down on said land an oil well. The oil well was completed on July 2, 1920, and from that time on produced oil in paying quantities.

On January 3, 1920, and on May 12, 1920, F. G. Morris, one of the plaintiffs and appellant here, notified some of the appellees that the contention of appellants was that the lease had terminated, and that further operations by the parties notified would be at their peril. Gilman & Simmons, being unable to repair the gas well, put down a new well near by, completing same in March, 1921, which is now a paying gas well.

The contention made by appellants is that, after the Gilman & Simmons gas well got out of repair by reason of the casing collapsing on March 23, 1920, and before the New Domain Oil & Gas Company came in on July 2, 1920, neither oil nor gas was produced and saved on the leased property in paying quantities, and for that reason the mineral lease ceased and terminated.

It might be noted that, in their efforts to develop said property in putting down the gas wells, Gilman & Simmons spent something like $100,000; the New Domain Oil & Gas Company spent on its oil well up to September 30, 1923, something in excess of $100,000; the Big Sandy Oil, Gas & Development Company spent about $40,000 in developing said property.

In brief, so far as the facts show, the mineral lease sought to be set aside and canceled is now in full force, and has been at all times since its execution, unless terminated by reason of the cessation of production of oil and

gas between March 23 and July 2, 1920. From July 2, 1920, to November 30, 1923, the New Domain Oil & Gas Company produced from its oil well oil of the market value of $53,011.87.

The Humble Oil & Refining Company paid to the New Domain Oil & Gas Company the sum of $46,385.39, and paid to Ward the sum of $3,291.04. The Humble Oil & Refining Company had in its possession and tendered into court $3,311.43, less expenses; said sum being one-sixteenth of the oil taken by it from the premises.

We will make additional statements when necessary in discussing the several propositions.

## Opinion.

The mineral lease involved in this suit was executed by Willie L. Scarborough, the owner of the land, and Hilary Moseley, having a mortgage on the land, to Herbert Lane, on December 9, 1914. The terms and conditions of that lease, so far as involved here, have been stated above. The lease provides that the lessee should have and hold the leased lands for a term of five years from December 9, 1914, and as much longer as gas or oil is produced in paying quantities, and that, should a well be found producing gas only, then the lessor should be paid for each such well the sum of $100 for each year so long as the gas is sold therefrom, payable quarterly while so marketed. A gas well of Gilman, Leonard & Simmons was drilled in and produced gas in paying quantities on December 6, 1919, three days prior to the expiration of the lease, and continued to produce gas in paying quantities until March 23, 1920. On December 8, 1919, Simmons paid to Ward, and Ward accepted, $100 in payment on the gas well.

The land was conveyed to Ward by Willie L. Scarborough on April 25, 1916, the deed reserving one-half the royalties that might accrue under the lease, and on February 25, 1918, she conveyed to Ward the one-half royalty reserved in the prior deed of conveyance. On June 15, 1918, and on December 19, 1918, Willie L. Scarborough filed suits against Ward, the first suit for the recovery of title to, and possession of, the mineral rights, and in the second suit for the recovery of the land, resulting in a recovery of all the land and Ward's title thereto, except one-half the royalty vested in Ward.

Neither suit attacked the validity of the lease involved here. The New Domain Oil & Gas Company alleged the bringing in of the gas well, and the payment and acceptance of the $100 as above, and that by reason thereof the life of the lease was extended; and other appellees adopted the answer, to which appellants excepted. The court overruled the exception and heard the evidence on the plea. Appellants excepted, and now insist that the payment and acceptance of the $100 did not have the effect to extend the life of the lease. It is insisted by appellees that, Ward then being the record owner of the leased premises, the payment and acceptance of the $100 extended the term of the lease one year.

We fail to see how the payment to Ward of the $100 of itself could be a material issue in the case. Under the terms of the lease, production of gas and the payment of the $100 were necessary to an extension of the lease during the year after the end of the five-year period. If the production of gas and the payment of the $100 to Ward on the 8th day of December, 1919, had the effect of continuing the life of the lease, it would have such effect during the year under the terms of the lease only so long as the gas well was producing gas. When the gas well collapsed on March 23, 1920, and thereafter produced no more gas, the payment of the $100 would be effective in continuing the lease only in the event the effort to remove the collapsed casing in the gas well, and thereby resume gas production, in connection with the payment, would have the effect to continue the life of the lease.

[1] In passing upon this question, we prefer to hold only that the payment of the $100 to Ward did not of itself, and apart from gas production, have the effect to continue the life of the lease for one year next thereafter, as gas production did not continue during the year. While the record in this case is quite extensive, and many propositions and counter propositions, collateral to the many questions, are presented in the several briefs filed, as suggested by counsel for Gilman, Simmons & Leonard, we think only two controlling questions are presented for solution, and those two possibly can be discussed together, as they both depend for solution upon the interpretation to be given the express provision in the original mineral lease of the land executed by Willie L. Scarborough and Hilary Moseley to Herbert Lane on the 9th day of December, 1914. The lease provides:

"To have and to hold unto and for the use of lessee for the term of five years from the date hereof, and as much longer as gas, oil, gold, silver, coal, lead or zinc is produced in paying quantities yielding to the lessors Willie Scarborough or her assigns one-eighth of all the oil produced and saved from the premises."

A gas well was brought in during the five-year period, and produced gas in paying quantities after the expiration of the five-year period and until March 23, 1920, when by reason of the casing in the well collapsing, gas production ceased and no gas was thereafter produced. Lessees (appellees here), in good faith, made an effort and spent much money in an effort to resume gas production, but without avail. On the 2d day of July, 1920, an oil well, commenced before the gas well ceased production, was brought in, and, since the 2d day of July, 1920, oil has been

produced in paying quantities. Also another gas well was later brought in, and has since produced gas in paying quantities.

The question presented is: Did the temporary cessation of production in paying quantity of both gas and oil, under the facts disclosed by the record, terminate the mineral lease? The facts disclosed by the record are the efforts made by appellees, in good faith, to resume gas production, and the expenditure of large amounts of money in their effort to resume gas production immediately after the casing collapsed, and continued such effort until the oil well was brought in on July 2d, and then resumed their effort at gas production by starting another well and continuing work thereon until gas was produced in the second well.

[2] We have no doubt but that the lessee, Lane, and his assigns, took a determinable fee under the mineral lease. The life of the lease before and after the five-year period depended upon production and the continuance of production in paying quantity of some one or more of the minerals mentioned. We need not discuss the determinable feature of the lease, but refer for a statement of the rule to Texas Co. v. Davis, 113 Tex. 321, 254 S. W. 304, 255 S. W. 601; Robinson v. Jacobs, 113 Tex. 231, 254 S. W. 309; Munsey v. Mornet Oil & Gas Co., 113 Tex. 212, 254 S. W. 311.

[3] We also think it immaterial what interpretation was placed upon the terms of the lease in the oil field as to production. The lease speaks for itself, and cannot be interpreted by an ex parte oil field construction of its requirements or meaning.

[4] We think, also, that, if the lease terminated by reason of cessation of production, the efforts of appellees and the expenditure of means to bring in other wells would not be effective to bring back or to give new life to the terminated lease. The question then to be decided is as to whether the lease terminated upon the temporary cessation of production in paying quantities of any of the minerals mentioned in the lease.

Appellants refer us to a number of cases as sustaining their contention such as Aycock v. Paraffine Oil Co. (Tex. Civ. App.) 210 S. W. 851; Texas & Pacific Coal & Oil Co. v. Bruce (Tex. Civ. App.) 233 S. W. 535; Masterson v. Amarillo Oil Co. (Tex. Civ. App.) 253 S. W. 915; Enfield v. Woods, 198 Ky. 328, 248 S. W. 842.

After a careful review of the above cases, without setting out the facts here, we have concluded that each one is essentially different, either in the verbiage of the lease or, in the facts, from the instant case, and to such extent as to be easily distinguishable from this case. In Cassell v. Crothers, 193 Pa. 359, 44 A. 446, to which we are referred, where the lease read: "For the sole purpose for drilling for oil and gas, for the term of ten years, and as long thereafter as oil or gas is found in paying quantities," three wells were producing oil under pump, when the lessee voluntarily, on November 14th, shut down operations for the winter, intending to resume pumping and production in the following spring. On May 14th following nothing had been done to resume operations. The court held the lease terminated, and used the following language:

"The moment she [lessee] failed to produce oil in paying quantities, that moment the tenancy became a tenancy at will. * * * A failure at any time after April 22, 1897 [when production commenced] to produce oil in paying quantities, ends it, and a holding over after that contingency could not, by implication, be for the purpose of producing oil. After the failure to produce oil in paying quantities, the plaintiff's rights [lessee here] are limited [if the defendant elects to terminate the lease] to the removal of his machinery."

In that case in April five wells were being pumped for oil. On July 1st four wells were producing oil, and on November 14th only three. At that time the three wells were making in all "about one or two barrels of oil per day, and were not at that time producing oil in paying quantities, a production of eight or ten barrels per day being necessary before it could be said that the premises leased were producing oil in paying quantities." The lease reserved the right in the lessee to remove the machinery, etc., from the premises. The lessor entered and took possession in May, 1898, including the wells and machinery.

[5] The above holding of the court was evidently made in view of the fact that the wells were not producing oil in paying quantities, and, as said by the court, the lessee was bound under her implied covenant to operate the wells only as long as oil and gas were found in paying quantities, and, if not, lessee had the right to shut down to remove machinery, and the statement fixed the theretofore uncertain date when entry of the lessor could be made. Where oil production in paying quantities did not exist, the holding over could not, by implication, be for the purpose of producing oil. Here we have no such state of facts. Gas was being produced in paying quantities; the shutdown of production was not voluntary, and the holding over was undoubtedly, in good faith, for the purpose of resuming production. It is only by implication that continuous production of oil or gas is required here. There are no express terms of forfeiture of the lease should a continuous production be not maintained. Nor is there any provision in the lease that temporary cessation of production should operate a forfeiture, and we do not, from the nature of the undertaking, believe such construction of the lease was reasonably within the contemplation of the parties in the execution of the lease. The evident intention and motives of both lessors and lessee

in executing the lease, in view of the small cash consideration paid, evidently the purpose of the parties in executing the lease, was that each might receive continuous profits from oil. or gas production, and that, if reasonable efforts were not used to maintain production when paying quantities of either gas or oil had been discovered, the lease could be forfeited for nonperformance of the condition subsequently contained in the lease.

We have concluded that, under the terms and provisions of the mineral lease as found in the record, where oil was produced in paying quantities within the five-year period, and the cause of cessation of production was thereafter necessarily unforeseen and unavoidable, and where the lessees in good faith used reasonable diligence to resume production, and at great outlay of money, and did, within a reasonable time, in view of the conditions disclosed by the record, resume production, a forfeiture for temporary cessation of production without fault of lessees should not be allowed as a matter of law. Such we believe to be a reasonable construction of the lease. Texas Pacific Coal & Oil Co. v. Bratton (Tex. Civ. App.) 239 S. W. 688; Benavides v. Hunt, 79 Tex. 395, 15 S. W. 396; Lamb v. Vansyckle, 205 Ky. 597, 266 S. W. 253; Zeller v. Book, 28 Ohio Cir. Ct. R. 119; South Penn Oil Co. v. Snodgrass, 71 W. Va. 438, 76 S. E. 961, 43 L. R. A. (N. S.) 848; Fisher v. Crescent Oil Co. (Tex. Civ. App.) 178 S. W. 905.

[6] The New Domain Oil & Gas Company discovered oil on the leased premises during the undoubted life of the lease at a depth of about 3,130 to 3,140 feet, though not in developed paying quantities, and drilled the well to a greater depth with the reasonable hope and expectation of finding oil in larger and paying quantities, and, as the undisputed evidence discloses, with the intent and purpose, in the event no better production was found at a lower level, to then plug back the well to where oil was first discovered. The well was drilled to a depth of 3,976 feet. No oil having been found at that depth, the well was plugged back to the 3,130 to 3,140 feet level, the well shot, and oil produced in paying quantities to the time of the trial of this case. When oil was first discovered, the New Domain Oil & Gas Company had expended in the production of oil in that well $67.182.- 12, and the total cost of the well to the company was in excess of $100,000.

We understand the law to be that, where a lessee of an oil and gas well discovers oil or gas in paying quantities within the term of the lease, though the quantity be not developed, but cased off for the purpose of drilling to greater depth after the term of the lease ends, with the reasonable expectation of developing greater production, but with the intention in good faith of returning to the first production, if a larger production is not obtained at the greater depth, under such cir-

cumstances the lease does not terminate on the ground that oil in paying quantities was not produced within the time period of the lease. Such seems to be the holding under lease provisions similar to the one here in T. P. Coal Co. v. Bratton (Tex. Civ. App.) 239 S. W. 688; T. P. Coal Co. v. Bruce (Tex. Civ. App.) 233 S. W. 535; South Penn Oil Co. v. Snodgrass, 71 W. Va. 438, 76 S. E. 961, 43 L. R. A. (N. S.) 848; Parks v. Sinoi Oil & Gas Co., 83 Okl. 295, 201 P. 517.

In our opinion the facts do not present cause for cancellation of the lease.

We are of the opinion, however, that appellants should recover of the Humble Oil & Refining Company the sum of $3,311.43, same being the value of one-sixteenth of the oil which that company admits by its answer to be in its possession, and tendered into court.

With the judgment of the trial court reformed as above, the case in all other respects is affirmed.