**WATSON et al. v. ROCHMILL et al.**

No. 1941.

Court of Civil Appeals of Texas. Eastland.

Oct. 27, 1939.

Rehearing Denied Dec. 1, 1939.

Ritchie & Ritchie, of Mineral Wells, and Lyndsay D. Hawkins, of Breckenridge, for appellants Geo. J. Watson, C. E. Allen, and L. L. Brown.

Slay & Simon, of Fort Worth, for appellant Farmers Mut. Royalty Syndicate, Inc.

J. R. Creighton, of Mineral Wells, for intervener Gordon Jones.

Slay & Simon, of Fort Worth, and W. O. Gross, of Mineral Wells, for appellees Henry Rochmill and F. G. Dubose.

GRISSOM, Justice.

Geo. J. Watson et al., alleging that they and Farmers Mutual Royalty Syndicate, Inc., were the owners of all the minerals in a certain tract of land covered by an

oil and gas lease, instituted this suit against Rochmill et al. for the purpose primarily of having a lease owned by Rochmill et al. adjudged to have terminated by virtue of the terms of the lease. The court instructed a verdict for defendants, and, as to a one-fourth royalty interest instructed a verdict for intervener Gordon Jones against the defendant Farmers Mutual Royalty Syndicate, Inc., and rendered judgment accordingly. Plaintiffs and defendant Farmers Mutual Royalty Syndicate, Inc., have appealed.

The facts, stated as briefly as possible, are shown by the undisputed evidence (except where the contrary is indicated) to be substantially as follows:

On May 14, 1925, an oil and gas lease was executed covering the land in controversy by L. C. Slemmons et al. to R. E. Moore et al. The lease contained the following provisions:

"It is agreed that this lease shall remain in force for a term of Three (3) years from May 25, 1925 and as long thereafter as oil or gas, or either of them is produced from said land by the lessee.

"In consideration of the premises the said lessee covenants and agrees:

"1st. To deliver to the credit of lessor, free of cost, in the pipe line to which they may connect their wells, the equal one-eighth part of all oil produced and saved from the leased premises."

The consideration recited was $10 and "the covenants and agreements" contained in the contract. The evidence shows that soon after the execution of this lease a well was drilled to what was supposed to be the top of a paying sand when a casing was ruined and "the hole lost." The rig was then moved a short distance, another well drilled and oil produced. About $60,-000 was spent in the development of the lease in question. After production was obtained, a connection with a pipe line was secured and appellee Rochmill acquired the interest of the original lessees. The well produced oil continuously from 1925 until about May 21, 1932. The oil, both the 7/8ths of the oil belonging to the assignees of the lessees and the 1/8th of the oil belonging to the royalty owners, was marketed through the Prairie Pipe Line Company until January 1931. At that time the Prairie Pipe Line Company severed its connection with the well and withdrew from that territory. There was no other pipe line in that territory. From January, 1931, to May, 1932, oil produced from the well was transported by trucks and sold to a refinery at Ranger. Said refinery purchased the oil belonging to the lessees and to the owners of the royalty interest. The appellants then owned the royalty, knew that said refinery was buying the oil and that it was being delivered to the refinery by trucks. Appellants, without comment, accepted said method of marketing the oil and accepted the royalty checks from the purchasing refinery. The trucks hauling the oil from the well to the refinery were designated by the Railroad Commission as pipe lines. The well produced about one barrel of oil to 10 barrels of salt water. It was low gravity oil. It was not as readily marketable as uncut oil of high gravity. About May 21, 1932, the refinery at Ranger refused to further take the oil from this lease. The price of oil generally reached an extremely low level, selling in East Texas at 10 cents a barrel. The oil market was almost completely demoralized. No market was available for the kind of oil produced on the lease. If the oil had been sold no profit could have been obtained since the price of hauling the oil from the well to a refinery was equal to or greater than the price of oil. In addition to the general business depression there was a special slump in the oil business. No oil was sold from this lease from May, 1932, to January, 1935, for the reasons above outlined. This condition was evidently considered by Rochmill to be temporary. From May, 1932, to January, 1935, Rochmill (a) employed Burt Slemmons to work on the well and guard the property; (b) Rochmill and his employee, Slemmons, constantly endeavored to procure a market for this oil. They contacted many independent oil men, oil companies, pipe line companies, refineries and the Railroad Commission in an effort to market the oil. No purchasers could be found. (c) Acid tests were made in the well and the well was acidized, a swabbing machine was brought from Ranger and the well was swabbed and cleaned out. A derrick was torn down, rebuilt and placed over the well in question, an engine house built, the tubing was pulled, rods were put in, complete pumping equipment was obtained and put on the well. A market for the oil having been, after diligent effort, finally obtained in January 1935, the production of oil was resumed by use of the pump. (d) Application was made to the

Railroad Commission and permission obtained to market the oil by truck to a refinery at Albany. (e) During the period when oil was not sold from the well, none of the personal property or equipment was removed from the lease. On the contrary, pumping equipment and other property was placed on the lease by Rochmill from May 1932 up to and including the day this suit was filed at an expense of about $8,000. (f) Rochmill paid taxes on the leasehold estate and personal property there situated up to and including the years 1932 to 1936. (g) After production of oil was resumed in January 1935; the oil was sold to refineries at Albany, Graham and Jacksboro. The oil was transported from the well to said refineries by truck, Rochmill having made application for and obtained permission to do so from the Railroad Commission. The manner of such sales and transportation was the same as in the prior sales to the refinery at Ranger in 1932, which method was known and acquiesced in by appellants. Said last mentioned refineries paid Rochmill for ⅞ths of the oil. Operation continued in such manner from January 1935 to April 1937 when appellants instituted this suit and a receiver was appointed. (h) From January 1935 to April 1937, pumping was done both in the daytime and night time and oil was hauled from the well both in daytime and at night time by trucks. (i) During all this time none of appellants took any affirmative action in connection with the property.

Two of the appellants live in Palo Pinto County where the well in question is located. One of them, according to the testimony, owns a ranch within about a mile and one half of the well. Although appellants contend that the lease, by virtue of its own provisions, terminated in May 1932, none of them asked Rochmill for a release, or to remove his personal property from the premises, nor did they do or say anything inconsistent with acquiescence in the actions of Rochmill in his possession, control and operation of said well and lease. None of the appellants rendered any of the property for taxation, or paid any taxes thereon, nor asserted any claim to or exercised any act of dominion over the minerals or personal property left on the lease. Appellants say that they had no knowledge of the fact that oil was being produced 24 hours a day from January 1935 to April 1937. (There is a conflict in the evidence as to whether Slemmons notified Watson of the fact of such production.) Under the instructed verdict, if it should be material whether plaintiffs had knowledge of the resumption of production, we must consider the case upon the theory that they had no such knowledge. It is evident that a very slight investigation, or inquiry, would have resulted in such information being obtained by appellants.

In June, 1938, plaintiffs Geo. J. Watson, C. E. Allen and L. L. Brown, filed their Second Amended Petition complaining of Henry Rochmill individually and as trustee, F. G. DuBose, Texas Pacific Coal & Oil Company, a corporation, Farmers Mutual Royalty Syndicate, Inc., a corporation, and Gordon Jones. Appellants alleged, among other things, the execution of the oil and gas lease; that plaintiffs and defendant Farmers Mutual Royalty Syndicate, Inc., and Gordon Jones "are now the owners of all the minerals underlying the above lands * * *." That by the terms of the lease lessor granted, etc., said property to the lessee for the sole purpose of mining and operating for oil and gas, and the conduct of operations generally in connection therewith, that the lease was for a term of three years from May 25, 1925 and as long thereafter as oil or gas be produced from said land by the lessee. That the lessee drilled an oil well upon the leased premises, that the well produced oil in paying quantities, that said well was the only producer ever drilled on any part of the leased premises; that Rochmill continued the operations of the lease until May 21, 1932, at which time the production ceased. That for sometime prior to May 21, 1932 production from the well had greatly declined "and the well was making excessive quantities of salt water, said defendant representing at the time that the well and lease could no longer be operated profitably. Thereupon and about May 21, 1932, the well being choked up, all efforts to produce oil from the well were discontinued, no activities or operations of any kind or character were conducted on any part of the leased premises for the production of minerals, and there was a total and complete cessation of production of oil or gas or any other minerals from said lands covered by the lease of May 14, 1925. Said defendant, his agents and employees, abandoned the premises and plaintiffs thereupon elected to terminate, and did terminate and cancel said lease and all

rights thereunder, and, the primary term having expired, said leasehold estate thereupon terminated and was forfeited by the failure to produce oil or gas or other minerals from the premises; and said defendant thereafter had no further rights under the lease or upon said premises."

The provision in the lease "It is agreed that this lease shall remain in force for a term of three (3) years from May 25, 1925 and as long thereafter as oil or gas, or either of them is produced from said land by the lessee" constituted a limitation on the estate granted to the lessee. The happening of the contingency therein mentioned, that is, cessation of production, after expiration of the primary term, would cause the lease to terminate by virtue of said provision of the lease. No re-entry, or suit, or other action was required by lessor to effect termination of the estate.

Appellants first proposition is to the effect that, because no oil was produced from the leased premises for two years and 7 months, the lease terminated and the court should have instructed a verdict for plaintiffs.

The question thus presented involves the construction of the words of limitation in the lease, namely, "as long thereafter as oil, or gas, or either of them, is produced from said land by the lessee." More particularly, the inquiry is: What did the parties mean by the word "produced"? Was it used in such a sense that the estate would terminate if the flow of oil was interrupted for any length of time whatever, regardless of the reason therefor? Would the estate terminate if production were shut off to clean out the well, or to acidize it, or because of a broken pipe, or anything else of a merely temporary nature? That any such meaning can be ascribed to the word is so unreasonable as not to be debatable. However, precedent is not wanting in the decisions to the effect that a temporary cessation of production does not terminate a lease, the duration of which is limited similarly to the one here involved. See 31 Tex.Jur. p. 908; Scarborough v. New Domain Oil & Gas Co., Tex.Civ.App., 276 S.W. 331; Texas Pacific Coal & Oil Co. v. Bratton, Tex.Civ.App., 239 S.W. 688. Isolated expressions in other decisions are to the same effect, but they may be of doubtful value due to the fact that they seem to recognize no distinction between the termination of a lease because of a limitation and termination by forfeiture. We are here considering the limitation of an estate concerning which there is rarely, if ever, any occasion to consider or discuss principles peculiar to equity jurisprudence. It is believed we may reasonably pursue the inquiry into the meaning of the limitation in question, based upon the premise that it was not the intention of the parties to the lease contract that the event or contingency which was to terminate the estate was a temporary cessation of the production of oil.

What, then, would constitute a cessation of production? More concretely, as applied to the facts of this case, the question is, did the evidence establish conclusively as a matter of law, or raise a fact issue to be submitted to the jury, that the cessation of production was not temporary? Plaintiffs had the burden of establishing that there had been a cessation of production within the meaning of the quoted provision of the lease. Since, according to the conclusion above announced, such a cessation would not be shown by a temporary cessation, it results that practically, and in effect, plaintiffs had the burden of establishing that the cessation of production relied upon as terminating the lease was not temporary.

What would constitute a cessation of production, disregarding, as our conclusions would require, all temporary cessations? Such a cessation would undoubtedly be shown by evidence which showed an abandonment of the lease. That, as has many times been held, would include as an essential element an intention of the lessee not to further produce. It would be possible, however, for evidence to exist within ten minutes after a physical cessation of production sufficient to show the character of cessation necessary to terminate the lease. Such evidence, of course, by its very nature would have to exclude the fact that the cessation was temporary. Manifestly, however, the time element would not be controlling. If not controlling in one case, it may well be questioned whether the mere element of time alone (that is, duration of cessation) may be controlling in any case.

The length of time from the cessation of production (whether temporary or not) to the resumption of production was about two years and seven months. Unless controlling effect be given to the time

element alone, then, we think, the undisputed evidence as hereinbefore detailed established conclusively that the cessation of production was temporary. Without intending to intimate that the character of cessation which constitutes a limitation upon the estate must be the equivalent of an abandonment, or that the time element is without effect in all cases, it is our conclusion that the time here shown when there was no production, in the light of the undisputed evidence, did not even raise a question of fact that the cessation of production was not temporary.

We think the court, for this reason, properly instructed a verdict for defendants Rochmill et al. It, therefore, becomes unnecessary for us to decide whether the instructed verdict was proper for other reasons. See, also, Masterson v. Amarillo Oil Co., Tex.Civ.App., 253 S.W. 908, 914; Lamb v. Vansyckle, 205 Ky. 597, 266 S.W. 253; Texas Pacific Coal & Oil Co. v. Bruce, Tex.Civ.App., 233 S.W. 535; Hines v. Hanover Co., Tex.Com.App., 23 S.W.2d 289, 290; Union Sulphur Co. v. Texas Gulf Sulphur Co., Tex.Civ.App., 42 S.W.2d 182, writ refused; Note, 72 A.L.R. 372.

As to the contest between Gordon Jones and Farmers Mutual Royalty Syndicate, Inc., as to ownership of a ¼th of the royalty, Jones' suit against the Royalty Syndicate was one in trespass to try title. Jones claimed title thereto by virtue of a personal judgment against the Manning Oil Corporation (through whom Farmers Mutual Royalty Syndicate, Inc., claimed title by a later purchase), an execution, levy and constable's deed by virtue of that judgment. The judgment was by default and recited "that the defendant has been duly and regularly cited to appear and answer."

Appellant Farmers Mutual Royalty Syndicate, Inc., takes the position that said judgment in favor of Jones in Jones v. Manning Oil Corporation, an Arizona corporation, was void, and, therefore, subject to collateral attack, and that said appellant was entitled to show its invalidity by introduction in evidence of the pleading, citation and return thereof in the case of Jones v. Manning Oil Corporation.

The petition contained the allegation that the Manning Oil Corporation was an Arizona corporation, doing business in Texas, "whose field agent in Texas is John Pierson and in whose absence J. C. Norman acts as such, both of whom may be served with process in Shackelford County, Texas."

The sheriff's return on the citation, insofar as is here material, was as follows:

"Came to hand on the 12 day of September, 1931, at 10:30 o'clock A. M., and executed in Shackelford County, Texas, by delivering to each of the within named defendants, in person, a true copy of this citation (together with the accompanying certified copy of the plaintiff's petition) at the following times and places, to-wit:

| NAME | DATE | | | TIME | |
| | Month | Day | Year | Hour | Min. |
| J C Norman | Sept. | 12 | 1931 | 10.45" | |

■ In a collateral attack on a judgment, a recital in the judgment that defendant was duly cited to appear is conclusive and lack of jurisdiction over the defendant cannot be shown by contradiction of such judgment recital by other portions of the record, such as the citation and sheriff's return thereon.

Henry v. Beauchamp, Tex.Civ.App., 39 S.W.2d 642; Treadway v. Eastburn, 57 Tex. 209; Stark v. Sims, 5 Cir., 230 F. 115, affirmed 5 Cir., 236 F. 731; Humphrey v. Beaumont Irrigating Co., 41 Tex. Civ.App. 308, 93 S.W. 180, writ refused; Gibbs v. Scales, 54 Tex.Civ.App. 96, 118 S.W. 188, writ refused; Martin v. Burns, 80 Tex. 676, 16 S.W. 1072; Chapman v. Kellogg, Tex.Com.App., 252 S.W. 151.

An exception to such general rule exists when the judgment containing such recital further recites the facts on which the conclusion of due service is based and such recited facts show want of service, or when some portion of the record is referred to in the judgment, and that portion of the record so referred to shows the judgment recital to be erroneous. Fowler v. Simpson, 79 Tex. 611, 15 S.W. 682; 23 Am.St.Rep. 370; Lutcher v. Allen, 43 Tex.Civ.App. 102, 95 S.W. 572, writ refused. Said exception is not applicable here.

■ Said appellant contends that another exception to the stated rule exists in the case of non residents; that a non resident defendant can make a collateral attack on a judgment and show lack of service of citation, contrary to the judgment recitals, by introduction of other portions of the record.

Said appellant cites in support of that contention the following cases: Watson

716

v. McClane, 18 Tex.Civ.App. 212, 45 S.W. 176, no writ of error; Lutcher v. Allen, 43 Tex.Civ.App. 102, 95 S.W. 572, writ refused; Essanay Film Mfg. Co. v. Kane, 258 U.S. 358, 42 S.Ct. 318, 319, 66 L.Ed. 658.

The first two cases simply hold, insofar as could be material here, that a personal judgment by default against a non resident defendant, upon citation by publication, is void, and, notwithstanding a recital of due service of process in the judgment, the pleading and process can be used to collaterally attack the judgment. Lutcher v. Allen, supra.

The third case above cited simply holds that a Federal court will not enjoin prosecution of a suit for damages in a state court against a non resident defendant upon whom service was attempted by "service of process upon the Secretary of State, as appellant's agent" upon the contention that such service was void and was not due process within the meaning of the 14th Amendment of the Federal Constitution, U.S.C.A., and that the threatened prosecution of the suit would result in taking appellant's property without due process of law. The injunction was denied and the court said: "Besides a challenge of the jurisdiction of the state court for want of due process over defendant in personam, to be interposed in that court, and, if overruled, followed by invoking the revisory jurisdiction of this court, the final judgment may be questioned collaterally, if in truth there be a want of due process, either defensively, as in Pennoyer v. Neff, 95 U.S. 714, 723-733, 24 L.Ed. 565 [569-572]; see, also, York v. Texas, 137 U.S. 15, 20, 21, 11 S.Ct. 9, 34 L.Ed. 604 [605]; Western Life Indemnity Co. v. Rupp, 235 U.S. 261, 273, 35 S.Ct. 37, 59 L.Ed. 220 [224]; Baker v. Baker, E. & Co., 242 U.S. 394, 401-403, 37 S.Ct. 152, 61 L.Ed. 386 [391-393]; or by adopting the more aggressive method pursued in Simon v. Southern R. Co., supra [236 U.S. 115, 35 S.Ct. 255, 59 L.Ed. 492]. See, also, Wells, F. & Co. v. Taylor, 254 U.S. 175, 183-185, 41 S.Ct. 93, 65 L.Ed. 205 [211, 212]. In short, observance by the federal courts, towards litigants in the state courts, of the comity prescribed by section 265, requires orderly procedure but involves no impairment of the substance of constitutional right."

It has been held that a personal judgment rendered against a non resident defendant based upon citation by publication is void and subject to collateral attack, regardless of recitals in the judgment of due service. However, we have no such situation here. The judgment was not based upon an attempt to obtain jurisdiction of the person of the defendant by service of citation by publication on a non resident out of the state, but upon personal service in Texas. We think the rule contended for, if correct, is not applicable here. See San Bernardo Townsite Co. v. Hocker, Tex.Civ.App., 176 S.W. 644, 646; Wm. Bondies & Co. v. Bassel-Flewellen, Tex.Civ.App., 28 S.W.2d 1109; 33 Tex.Jur. 853, 25 Tex.Jur. 703; Treadway v. Eastburn, 57 Tex. 209.

 Since the title of defendant Farmers Mutual Royalty Syndicate, Inc., depended upon invalidity of the judgment under which Jones claimed title, we think the court did not err in instructing a verdict for Jones against said Royalty Syndicate.

The judgment is affirmed.