**HENNESSY et al. v. JUNCTION OIL & GAS CO. et al.**

No. 9086—Opinion Filed June 3, 1919.

Rehearing Denied July 22, 1919.

(Syllabus by the Court.)

1. **Oil and Gas—Oil Lease—Duty of Exploration—Diligence—Discovery of Gas—Effect—Development—Term of Lease.**

In an oil and gas mining lease granting to the lessee all oil, gas, and other minerals

found in and under the premises' leased, together with the right to enter at all times for the purpose of drilling and operating, and to erect all buildings and structures, and the exclusive right to lay all pipes and sluices necessary for the production and transportation of oil, gas, and other minerals taken from the premises, the lessor to receive one-eighth part of all oil or other minerals produced and saved from said premises, to be delivered in pipe line by the lessee, and, if gas only was found in quantities large enough to transport, then lessor to receive $100 per year for the product of each and every well so transported, and free gas for dwelling, heating, and lighting purposes, held that, nothing appearing to the contrary, it is to be presumed that the parties had in contemplation the lessee would make a reasonable effort to produce oil, and if the lessee in good faith, honestly attempting to discover oil, but failing to find oil, should find gas in paying quantities during the life of the lease, and upon payment to the lessor of the amount stipulated for gas well, then the lease would be continued as therein provided for.

**2. Oil and Gas—Oil Lease—Reservation—Description.**

In an oil and gas mining lease granting to the lessee all the oil, gas, and other minerals in and under the premises leased, but excepting a portion of the lands from drilling operations, the portion so excepted or reserved must be described with sufficient certainty as to be easy of identification.

**3. Oil and Gas—Oil Lease—Gas in Paying Quantities.**

In an oil and gas mining lease, providing, if gas only is found in quantities large enough to transport, then lessor to receive $100 for each and every well from which gas is so transported, the lessee, acting in good faith and upon his honest judgment, not an arbitrary judgment, or one springing from an ulterior purpose to secure an unfair advantage of the lessor, is to determine whether or not the well brought in produces gas in quantities large enough to transport.

Error from District Court, Kay County: W. M. Bowles, Judge.

Action by Maggie Hennessy and another against the Junction Oil & Gas Company and another. From judgment for defendants, plaintiffs bring error. Affirmed.

J. F. King, for plaintiffs in error.

John H. Brennan. Hayes McCoy. Otto Massey. and R. H. Hudson, for defendant in error Diescher.

John S. Burger. for defendant in error Junction Oil & Gas Co.

PITCHFORD, J. This is an appeal by the plaintiffs in error from the judgment of the district court of Kay county, wherein the court sustained a demurrer to the evidence of the plaintiffs and entered a final decree in favor of the defendants. The action was commenced on the 15th day of June, 1916, and was brought to have a certain oil and gas lease owned by the defendant the Junction Oil & Gas Company declared null and void and of no force and effect, and to have the same canceled and removed as a cloud on the title of the plaintiffs. The lease was executed by the plaintiffs, Maggie Hennessy and J. F. Hennessy, on the 14th day of January, 1911, and by mesne conveyance was assigned to the Junction Oil & Gas Company on December 7, 1914.

The lease provided that in consideration of the sum of $1, the receipt of which was acknowledged, the plaintiffs granted to the lessees all the oil, gas, and other minerals found in and under the real estate therein described, together with the right to enter thereon at all times for the purpose of drilling and operating and to erect and maintain all buildings and structures, and the exclusive right to lay all pipes or sluices necessary for the production and transportation of oil. gas. and other minerals taken from said premises, excepting and reserving to the plaintiffs one-eighth part of all oil or other minerals produced and saved from said premises to be delivered in pipe line by the defendants. It was further provided that, if gas only was found in quantities large enough to transport, then the plaintiffs would receive $100 per year for the product of each and every well so transported, and also free gas for dwelling on the above-described land for heating and lighting purposes; and further that, if no well was commenced within 18 months, then the grant to become null and void, unless the defendants should pay annually thereafter in cash the sum of $16 on said land, to be deposited to the credit of the plaintiffs in the bank at Braman, Okla. The lease was to be operated for a period of five years from the date thereof, or so long as gas, oil, or other minerals were to be found in paying quantities.

It was further agreed that the lessor, in consideration of the agreements of the lessee contained in the lease, agreed that the lessee. his heirs or assigns, might at any time surrender up the lease, and be thereby forever discharged and released from all moneys due or to become due, and from all obligations accrued or to accrue under the laws. There was a further provision that the second party (the defendants) agreed not to drill on a certain piece of land now farmed in corn unless agreeable to first party. and also to pay all damages to growing crops. Prior to November, 1915, nothing had been done by the lessee, except the payment of the delay money.

and on the 6th day of December, 1915, plaintiffs served a notice on the Junction Oil & Gas Company, declaring a forfeiture of the lease for nonperformance of the covenants and conditions therein contained, and notified the defendant that any entrance in or upon the premises, or any work done, or attempted to be done, on the premises by reason of any alleged rights under said lease, would be treated by the lessors as a trespass upon their rights.

On the 9th day of December, 1915, the defendant the Junction Oil & Gas Company sold to the defendant A. J. Diescher the gas rights under the said lease. On the 11th day of December, 1915, the defendant the Junction Oil & Gas Company secured from Hon. Joshua L. Roberson, judge of the county court of Kay county, an order of injunction restraining the plaintiffs from interfering with the defendant the Junction Oil & Gas Company, its servants, agents, or employes, in entering upon and operating said lands for oil and gas purposes under the terms of said lease. Thereafter, on January 3, 1916, the plaintiffs filed in the district court of Kay county their general demurrer to the petition of the Junction Oil & Gas Company. No further steps were taken in the action until February 28, 1916, upon which date the Junction Oil & Gas Company filed its motion to dismiss the said action, and thereafter, on May 6th following, the court dismissed the case without prejudice at the cost of the plaintiffs.

As we have seen, the instant case was filed on the 15th of June, 1916. On September 4th thereafter, the defendant A. J. Diescher, upon his application, was made a party defendant in the case and filed his separate answer. The cause was tried to the court on the 13th day of October, 1916, and after plaintiffs had introduced their evidence, on motion of the defendants, a demurrer thereto was sustained and judgment entered against the plaintiffs. From this judgment plaintiffs prosecute this appeal.

There are a number of assignments of error, which may all be grouped under one head, namely, that the court erred in sustaining the demurrer of the defendants to the evidence of the plaintiffs.

This case is in many respects similar to that of Roach v. Junction Oil & Gas Co., 72 Oklahoma, 179 Pac. 934, decided by this court on April 1, 1919. We would have little trouble in readily reaching a conclusion by following the opinion therein announced, were it not for the contention on the part of the plaintiffs to the effect that no effort was made to discover oil, and that the gas well was drilled merely for the purpose of attempting to extend the life of the lease beyond five years, and upon certain corn lands specifically reserved in the lease, whereon the defendants were not to drill without the consent of plaintiffs. This last provision was that the defendants should not drill upon a certain piece of land "now farmed in corn, unless agreeable to first party, and also to pay all damages to growing crops." The rule is settled by a long line of decisions holding that the lessor may except any portion or portions of his land from drilling operations, and the lessee, accepting the lease with this provision, would and should be bound thereby. · The rule as stated in Thornton's Law Relating to Oil and Gas, (2nd Ed.) p. 855, is as follows:

"A reservation by the lessor of lands around his buildings is a retention of the right to occupy the space therein reserved to the entire exclusion of the lessee as much so as if he was an entire stranger to the lease. The lessee may exhaust oil or gas thereunder, if he can do so by the sinking of wells upon that part of the leased premises next to the land reserved, but not otherwise. If the lessee invade these premises, the lessor has the same remedy against him as if the lease had never been granted him or as he would have against any stranger."

That is, the lessee may be restrained from drilling; but we do not understand that, in the event the lessee does drill on the portion so reserved, he thereby forfeits his lease. The lease in the case at bar was executed on the 14th day of January, 1911. At that time, we know, as a matter of common knowledge, there was no growing corn on the portion reserved. The language is "now farmed in corn." The evidence shows that this land was farmed in corn in 1909, 1910, and 1911. It is not necessary for us to decide just what was intended by this language. The lower court made no finding on this point, but sustained the demurrer to the entire evidence. The gas well drilled by the defendants was, as contended by the plaintiffs, upon the lands reserved; that is, reserved from drilling. The defendants, however, contend that the plaintiffs are estopped from at this late date complaining that the well was upon the reserved portion of the land for the reason, as they say, that the plaintiffs, living in sight of the well, seeing the drilling going on, and knowing that the defendants were being put to a great expense in the drilling, remained silent, and we are cited to the rule in equity:

"He who remains silent when equity and good conscience demand that he shall speak shall not be permitted to speak when equity and good conscience demand that he shall remain silent."

Also to the rule:

"Whatever leads, or would lead, a reasonable person to believe that no objection exists, he is justified in relying upon, and when upon this reliance he proceeds and expends money and changes his position in a way that he would not do if he had any reason to suppose an objection existed, an estoppel will arise to complain."

We are unable to agree with the defendants on this point. We rather appreciate the situation of the plaintiffs, who have passed the meridian of life, having resided upon the leased premises, which is their homestead, for many years. It is true, they sought to declare the lease ineffective and served the defendant the Junction Oil & Gas Company with notice of their election to declare the lease forfeited and of no effect, and forbade any entrance upon the premises by the defendant. Thereupon, the injunction was secured restraining the plaintiffs from in any manner interfering with the defendant, its servants, agents, or employes in entering upon and operating for oil and gas on said land. We highly commend the attitude of the plaintiffs, as to the respect shown by them relative to the restraining order, and are convinced that it would be fortunate for the welfare of our country if every citizen would manifest a like respect for the law and orders of court. J. H. Hennessy, one of the plaintiffs, while upon the witness stand, testified:

"I didn't go near the well, only once or twice. I didn't want to give the company any chance to get hold of me after that restraining order was served. I was willing before that to get in trouble with them."

We conclude that the plaintiffs have not placed themselves in a position where they cannot be heard to complain that the lease has been violated by drilling the gas well upon that portion of the premises that was expressly reserved. As to whether or not the lease was upon reserved premises is to be ascertained from all the facts and circumstances known to the parties at the time. As we have seen, the trial court failed to make any finding upon this question. However, we are of the opinion that when an oil and gas lease is executed covering lands accurately described and a portion thereof is reserved from drilling operations it is in no manner a reservation of the oil and gas to the lessor, but is in the nature of a limitation of the right of the lessee to drill at or upon a certain part of the leased premises, and the portion so reserved should be described with sufficient certainty to be easily capable of identification. In the lease herein involved, we are unable to ascertain from the lease, or the evidence, whether the restriction referred to kaffir corn, broom corn, Indian corn, or what kind of corn land was intended. The reservation, exception, or limitation is too vague, indefinite, and uncertain, and hardly capable of identification. Brown v. Spilman, 155 U. S. 665, 15 Sup. Ct. 245, 39 L. Ed. 304; Lynch v. Burford, 201 Pa. 52, 50 Atl. 228.

Did the court commit error in sustaining the demurrer? It appears that the plaintiffs had accepted the commutation money for delay without objection; therefore the lease would not terminate prior to the 14th of January, 1916, and not then except upon condition that by that date the defendants failed to develop an oil or gas well in paying quantities, and in the event that gas only was found in paying quantities large enough to transport, plaintiffs to receive $100 for the product of each and every well. On the 24th day of December, 1915, after drilling to a depth of 748½ feet, gas amounting to 2,000,-000 cubic feet was discovered. At that depth, the well was packed and shut down, and afterwards connected with the pipe line. After the completion of the well, defendants tendered to the plaintiffs $100, which was refused.

The further question presented to us is: Has there been a substantial compliance with the terms of the lease? We should first inquire: What did the parties have in contemplation when the lease was executed? The lessors were no doubt anxious to have the land explored for their benefit, but explored for what? For an answer to this question, we must examine the lease. We there find the clause granting to the lessee all the oil, gas, and other minerals found in and under the premises leased, together with the right to enter at all times for the purpose of drilling and operating, and to erect and maintain all buildings and structures, and the exclusive right to lay all pipes or sluices necessary for the production and transportation of oil, gas, or other minerals taken from the premises, the lessor to receive one-eighth or all oil or other minerals produced, and, if gas only was found in quantities large enough to transport, then the lessors were to receive $100 per year for the product of each and every well so transported, and also free gas, etc. By the terms of the lease, the lessee was given 18 months in which to commence a well, the only consideration therefor paid by the lessee being the $1 paid at the execution of the lease; and, in the event there was a failure to commence a well within the stipulated time, the lease should become void unless the lessee paid the lessors $16 per year commutation money for delay, but this payment could not extend the lease beyond the five years, unless certain conditions were met

by the lessee. Nothing appearing to the contrary, we are justified in the presumption that ordinarily it is in contemplation of the parties entering into an oil and gas mining lease that the lessee will make a reasonable effort to discover oil. In the case of Indiana Oil, Gas & Devel. Co. v. McCrory et al., 42 Okla. 136, 140 Pac. 610, it is said:

. "Where the object of the operations contemplated by an oil and gas lease is to obtain a benefit or profit for both lessor and lessee, neither is, in the absence of a stipulation to that effect, the arbiter of the extent to which, or the diligence with which, the operation shall proceed; but both are bound by the standard of what, in the circumstances, would be reasonably expected of an operator of ordinary prudence, having regard to the interests of both."

And further:

"A court of equity will decree a forfeiture of an oil and gas lease on account of a breach of an implied covenant to diligently operate and develop the property when such forfeiture will effectuate justice. The granting of such relief depends upon the facts and circumstances surrounding each particular case."

If the purpose of the parties to the lease was in the first instance to secure an oil well, and if the lessee, in good faith, honestly attempting to carry out the terms and provisions of the lease, should drill for oil, and, failing to find oil, find gas in paying quantities within five years, then, upon the payment of $100, the lease could be continued as provided for. Did the lessee, within the time allowed, indicate on honest purpose to comply with the terms of the lease? In Kleppner v. Lemon, 176 Pa. 502, 35 Atl. 109, the court said:

"It is an implied condition of every lease of land for the production of oil therefrom that, when the existence of oil in paying quantities is made apparent, the lessee shall put down so many wells as may be reasonably necessary to secure the oil for the common advantage of both lessor and lessee. In determining when and where such wells shall be located, regard must be had to the operations on adjoining lands and to the well-known fact that a well will drain a territory of much larger extent when the sand rock in which the oil or gas is found is of coarse and loose texture, than when it is of fine grain and compact character. Whatever ordinary knowledge and care would dictate as to the proper thing to be done for the interest of both lessor and lessee under any given circumstances is that which the law requires to be done as an implied stipulation of the contract."

The evidence discloses that, at the time plaintiffs executed the lease herein, gas had been found in what was afterwards desig-

nated as the Blackwell gas field. It appears that two wells had been brought in, namely, the Pratt and Shurts wells, three or four miles from the premises leased by plaintiffs. Mrs. Hennessy testified that she had leased the land for oil and gas, and expected to get either, should it be there. Mr. Hennessy testified that, at the time he executed the lease, he was told by the lessee that his purpose was to get a few leases in the vicinity for developing, and his intention was to supply gas to Chilocco; that at the time there was no known natural gas field in that immediate vicinity; that no natural gas wells had been developed, the nearest well being three or four miles from the premises leased. It was further disclosed that the lessee had promised at the time that a pipe line would be run to Chilocco, and that the plaintiffs could connect or hitch on to that line. In 1913, plaintiffs connected with the gas line of the defendant the Junction Oil & Gas Company, and used gas until they claimed their lease expired in January, 1916. It appears that this gas was used by the plaintiffs free of any charge. The first oil well in what might be called that vicinity was brought in some time during the year 1913. This well was known as the Swinson well, located 1½ miles southeast of the lands of the lessors. This seems to have been a small well, and considering the depth, in connection with the flow, it was not considered a satisfactory well. After this, Mr. B. B. Jones drilled several wells, which proved to be dry holes, one of which was within 980 feet of plaintiffs' land. In July, 1915, the Alberti well was brought in. This proved to be a fine well, producing something like 800 barrels per day. The oil situation in that vicinity appears to have been absolutely discouraging until the Alberti well was brought in.

The plaintiffs further claim that they are entitled to have the lease canceled on the additional ground that it was the duty of the lessee to use a standard rig and drill to a depth of 3,000 or 3,400 feet, in order to test for oil, as oil had not been found in that vicinity at a lesser depth, and that they have the right under and by virtue of the terms of the lease to have the lands in the first instance drilled for oil. This was not in contemplation of the parties at the time the lease was executed. At that time, all that was expected, or hoped for, was gas. This was clearly shown from the testimony of each of the plaintiffs.

There appears to have been no dispute or misunderstanding of the rights of the respective parties until after the Alberti well was brought in. In the month of November, the lessee was forbidden to go upon the premises on the theory that the lease had been for-

feited, for the reason that defendants had made no effort to develop oil, and for the additional reason that, having so failed, the lessee had no right to seek the development of a gas well. The plaintiffs are hardly in a situation to claim the forfeiture of the lease prior to the 14th day of January, 1916, for the reason that without demur or protest they received the commutation or delay money in July, which extended the life of the lease to the 14th day of January, 1916. The receipt of this money extended all the rights of the lessee until the last-named date. On the 24th of December, 1915, the defendants, after going to a depth of 748½ feet, brought in a gas well with a capacity of 2,000,000 cubic feet. The evidence is silent as to when this well was connected and the gas transported, and is unsatisfactory as to whether the gas was found in quantities large enough to transport. The burden of proof in this regard was upon the plaintiffs, and, in the absence of any showing to the contrary, the rule seems to be well settled that the lessee is to determine, acting in good faith and upon his honest judgment, as to whether or not the well brought in would be a paying well; that is, in producing quantities large enough to transport. We do not mean an arbitrary judgment, or one springing from an ulterior purpose to get some unfair advantage of the lessor, but a judgment arrived at by acting in good faith and upon sound business principles. Thornton's Law of Oil and Gas, (3d Ed.) sec. 857.

In Roach v. Junction Oil & Gas Co., supra, Hardy, C. J., in delivering the opinion, said:

"When defendant found gas in quantities large enough to transport within the five-year period, it then became vested with a limited estate in the premises for the purpose of transporting this gas according to the terms of the lease. The lease does not necessarily mean that the gas should in fact be transported within the five years. Upon the discovery thereof in quantities large enough to transport, the plaintiff was entitled to $100 per year for the product of each and every well so transported, and this sum was tendered to her by defendants in accordance with the terms of the lease. The amount of her revenue did not depend upon the amount of gas transported, but was a fixed and definite sum, with the additional privilege of using gas for domestic purposes. So long as she received payment of the $100 per annum and had the use of gas for domestic purposes, she was entitled to claim no other revenue or consideration from lessee on account of the well in question."

The judgment of the lower court is affirmed.

OWEN, C. J., and McNEILL, HIGGINS, and SHARP, JJ., concur.