**BOULDIN et ux. v. GULF PRODUCTION CO.**
**(No. 11927.)**

Court of Civil Appeals of Texas. Fort Worth.
March 17, 1928.

Rehearing Denied April 21, 1928.

1. **Mines and minerals** ⬅73—**Lease conveying right to enter and appropriate oil and gas on payment of royalties is conveyance of interest in land.**

An oil lease in usual form, conveying to grantee the right to enter and operate thereon for discovery of oil and gas, and to appropriate same, paying to lessor a certain portion of profits as royalties, is a conveyance of an interest in the land, even though no language be used specifically conveying title.

2. **Mines and minerals** ⬅73—**Oil lease, terminable on lessee's failure to perform conditions optional with lessee, held conveyance on conditions subsequent.**

Lease granting oil and gas under land, subject to payment to lessors of royalties reserved, and terminable by lessor on lessee's failure to perform certain conditions optional with lessee, *held* conveyance on conditions subsequent.

3. **Mines and minerals** ⬅78(2)—**Ambiguous forfeiture provision of oil lease will not be enforced.**

Ambiguous forfeiture provision of oil and gas lease will not be enforced.

4. **Mines and minerals** ⬅73½—**Time is of essence of mineral lease.**

Time is of the essence of a mineral lease, such as for oil and gas, especially when lease is not on covenant to be performed by lessee, but merely on condition, performance of which is entirely optional with lessee.

5. **Mines and minerals** ⬅73½—**Provision for keeping lease alive, in absence of exploration, held inapplicable if drilling was commenced before expiration of original term, regardless of discovery of oil in paying quantities.**

Where oil and gas lease provided that it should terminate, if drilling operations were not begun before certain date, unless lessee made certain payments to keep it alive during successive periods, not exceeding a total of four years from date of first extension, which would be five years from date of lease, and that, if oil or gas in paying quantities should be discovered, lease should remain in effect for 10 years thereafter, and as much longer as production continued in paying quantities, *held* that five-year limitation period did not apply, if drilling operations were begun within such period, regardless of whether oil in paying quantities was discovered during that period.

6. **Mines and minerals** ⬅73½—**Lessee has right to determine whether oil and gas have been discovered in paying quantities.**

Lessee has right to determine whether oil and gas in paying quantities have been discovered within provisions of oil lease, making rights of parties dependent on such discovery.

7. **Mines and minerals** ⬅73—**Rule of strict construction of mineral lease is subordinate to primary rule of reasonable construction.**

Rule of strict construction of mineral lease, whether applied against lessor or against lessee, is always subordinate to primary rule of reasonable construction.

8. **Mines and minerals** ⬅75—**Discovery of oil on last day of exploration period and subsequent production of oil in paying quantities held "discovery of oil in paying quantities," within exploration period as affecting extension.**

Where presence of oil was discovered on last day of five-year period for exploration and discovery, and thereafter, without further drilling, oil was produced in paying quantities, *held* that oil was "discovered in paying quantities" during the five-year period within provision making discovery during such period a necessary condition to the extension of lease beyond that period.

9. **Mines and minerals** ⬅73—**Any ambiguity in oil lease held not to authorize applying rule of strict construction against lessee.**

Any ambiguity in provisions of oil and gas lease *held* no reason for applying rule of strict construction against lessee rather than against lessors, though lease was prepared by lessee.

10. **Mines and minerals** ⬅73—**Rule of strict construction held inapplicable to unambiguous oil and gas lease.**

Where there was no ambiguity in terms of oil and gas lease, rule of strict construction had no application.

On Motion for Rehearing.

11. **Mines and minerals** ⬅73—**Production of oil or gas during exploration period is not required; "discover."**

Under usual oil and gas lease fixing definite period for exploration by lessee, production of oil or gas within that period in paying quantities is not required of lessee, since primary meaning of word "discover" does not include production, but merely means "to find."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Discovery.]

Appeal from District Court, Montague County; Vincent Stine, Judge.

Suit by E. J. Bouldin and wife against the Gulf Production Company. Judgment for defendant, and plaintiffs appeal. Affirmed.

Donald & Donald, of Bowie, and Kay-Akin & Smedley, of Wichita Falls, for appellants.

D. C. Proctor, of Fort Worth, and Carrigan, Britain, Morgan & King and H. R. Wilson, all of Wichita Falls, for appellee.

DUNKLIN, J. On March 10, 1922, E. J. Bouldin and wife, E. C. Bouldin, executed to H. E. McMahon an oil and gas lease on 322 acres of land in Montague county. On April 26, 1926, McMahon assigned the lease on 80

acres of the tract to C. U. Daniels, who, in turn, assigned the same to the Gulf Production Company.

E. J. Bouldin and wife instituted this suit in form of trespass to try title against the Gulf Production Company to recover the 80 acres last mentioned. And, from a judgment in favor of the defendant, the plaintiffs have prosecuted this appeal.

The only issue presented in the trial court and in this court was whether or not the lease on the land in controversy was forfeited by the alleged failure of the defendant to drill a well and discover oil in paying quantities within the time and in accordance with the provisions stipulated in the lease.

The lease is quite lengthy, and we shall set out only such portions thereof as in our opinion have a material bearing upon the issue to be determined. In typing those portions we have for convenient reference italicized certain terms, which, however, are not italicized in the instrument. The lease begins as follows:

(A) "Know all men by these presents that we, E. J. Bouldin and wife, E. C. Bouldin, of the post office of Spanish Fort, state of Texas, hereinafter called lessor (whether one or more), for and in consideration of three hundred and twenty two dollars, cash in hand paid, do hereby lease unto H. E. McMahon, of the post office of Nocona, state of Texas, hereinafter called lessee, the following described land, situated in the county of Montague and state of Texas:" Then follows a description of the land, after which is the following:

(B) "The purpose of this lease is such that so long as it remains in force the lessee shall have exclusive right to prospect and drill on said land for oil and gas and remove the same therefrom, to erect and maintain thereon and remove therefrom all necessary or proper structure and equipment, including the right to pull the casing from wells, and to install and maintain thereon and remove therefrom all tanks and other means of storage and all pipes and other means of transportation, also the right of ingress and egress at all times, for any of said purposes, *and subject to the royalties hereinafter reserved, all of the oil and gas in and under said land is hereby granted and conveyed to the lessee.*"

Then follows stipulations fixing the amount of royalties reserved by the lessor to be paid by the lessee.

The following are further provisions:

(C) "*If operations for the drilling of an oil or gas well are not begun on said land on or before the 10th day of March, 1923,* this lease shall then terminate as to both parties unless the lessee on or before said date shall pay or tender to the lessor or to the credit of the lessor, in the Farmers' & Merchants' National Bank of Nocona, Tex., which shall continue as a depository regardless of change or divisions in the ownership of the land, the sum of $161.00, such payment or tender may be made in the check or draft of the lessee, and however made shall operate to extend said time limit and keep this lease in force for six months from said date *without any drilling operations.* Thereafter, in like manner and upon like payments or tenders in the same amount by the lessee *and without any drilling operations,* said time limit may be further extended and this lease kept in force for like periods of time successively, six months in each instance, *but in the absence of drilling operations* this lease cannot be kept in force by such payments or tenders for a total period longer than four years from the date of the first extension. And if by partial assignment hereof, or otherwise, this lease shall become the subject of plural ownership in severalty, then and in that event proportionate payments or tenders corresponding to any such ownership may be so made and extensions thereby obtained to the extent of the acreage covered by the payment or tender. Both drilling operations and payments or tenders are not required, and the lessee may alternate between drilling, operations and payments or tenders during the above mentioned period and prior to the discovery of oil or gas in paying quantities, having twenty days after any election of the lessee to discontinue or suspend drilling operations in which to make payment or tender covering the then current period of six months, or the unexpired portion thereof, and the right to resume drilling operations when periods of discontinuance or suspension have expired and drilling operations anywhere on said leased land shall be effective as to the whole, but no payment or tender shall be necessary when a discontinuance or suspension of drilling operations is only temporary and is due to accident or some cause beyond the control of the lessee, or is not at the voluntary election of the lessee.

(D) "It is understood and expressly agreed that the consideration first recited in this lease, the down cash payment, receipt of which is hereby acknowledged by the lessor, the obligation of the lessee expressed in the next ensuing paragraph hereof, shall be held to support and sustain, not only the privileges granted to the date first written in the last preceding paragraph hereof, the date fixed for the first extension, but also the lessee's option of extending the time limit and keeping this lease in force as aforesaid, as well as any and all other rights and privileges conferred on the lessee by this instrument, but save as stated in said next ensuing paragraph hereof, the lessee shall not be obligated against the wish or option of the lessee to drill or otherwise carry on any operations hereunder.

(E) "If during the period of any extension of this lease and *prior to the discovery of oil and gas* on said land there shall be drilled on adjacent land, and within 200 feet of any line of the leased land, a well producing daily for thirty consecutive days as much as 50 barrels of oil acceptable in quality to pipe line companies, the lessee, with reasonable diligence, will begin and prosecute the drilling of a well on the leased land in a *faithful effort to reach the stratum and produce* oil on the leased land.

(F) "*If the lessee shall drill a well and discover oil or gas in paying quantities* in or under said leased land, then this lease shall remain *in full force and effect for ten years from such discovery,* and as much longer as oil or gas is produced in paying quantities, and having so discovered oil or gas in paying quanti-

ties, the lessee shall be exempt from loss or forfeiture of this lease in whole or in part except after judicial ascertainment of *forfeiture* and a reasonable opportunity to save the lease after such ascertainment or at the election of the lessee to save each producing well and have the lease remain in force to the extent of ten acres of land to be designated by the lessee, surrounding each producing well.

(G) "When drilling or other operations are delayed or interrupted by fire, storm, flood, war, rebellion, insurrection, riot, strike, differences with workmen, or failure of carriers to transport or furnish facilities for transportation, or as a result of some order, requisition or necessity of the government, or as the result of any cause whatsoever, beyond the control of the lessee, *the time of such delay or interruption shall not be counted against the lessee, anything in this lease to the contrary notwithstanding.*"

In appellants' brief the following is said:

"The question in controversy in the case is whether or not the oil and gas lease under which the defendant holds terminated at the end of five years from its date. The case involves, first, the correct construction and meaning of the oil and gas lease, and, second, whether or not the defendant within the time required by the lease discovered oil in paying quantities."

The five-year period, beginning March 10, 1922, the date of the lease, ended March 10, 1927. All rentals for the five-year period were paid. Two dry holes were drilled on portions of the 322-acre tract other than the 80 acres in controversy, but those wells were drilled by other persons than the Gulf Production Company. The company last named did nothing toward drilling a well on the land in controversy until February 18, 1927, when a location for a well was made by its engineer. Following that location, a derrick was built, and a drilling rig was moved on, but the fell was not actually spudded in until March 4, 1927. Drilling operations were continued thereafter both day and night until March 9th, when the driller discovered oil showings in the cutting box, and on that date a core of the well was taken which showed indications of oil. The driller in charge deemed such showing of oil sufficient to justify the setting of casing, and accordingly the casing was set and cemented in on March 10, 1927, the date of the expiration of the five-year period noted above. The casing was then allowed to set for five days, at the end of which time the plug was drilled out and the mud was swabbed out—on the 15th or 16th of March—and within 30 minutes after it was swabbed it stood 80 feet deep in oil. The oil was run into a tank, and on March 16th the gauge of the tank showed 32½ barrels; on March 17th the well produced 50 barrels; on March 18th, 45 barrels; on March 19th it was again swabbed and put on the pump, and on March 20th it produced 40 bar-

rels, and thereafter and until April 17th it produced on an average of 30 to 35 barrels each day. The well was drilled 824 feet deep.

According to testimony of witnesses introduced by defendant, it could not be definitely determined whether or not the well was a producer until after the mud was swabbed out, although they believed from indications that it would be a producer.

The case was tried before a jury, and at the conclusion of the evidence the plaintiffs moved the court to instruct a verdict in their favor, and, in the alternative, for a submission to the jury of the following special issue:

"Did the defendant on or before March 10, 1927, discover oil in paying quantities on the land described in plaintiffs' petition?"

Both of those motions were overruled, and, upon request of the defendant therefor, the court instructed a verdict in its favor.

[1] It is no longer an open question in this state that an oil lease in the usual form, conveying to the grantee the right to enter and operate thereon for the discovery of oil and gas and to appropriate the same, paying to the lessor a certain portion of the profits as royalties, is a conveyance of an interest in the land, even though no language be used specifically conveying title. Stephens County v. Oil & Gas Co., 113 Tex. 160, 254 S. W. 290, 29 A. L. R. 566. Furthermore, the lease in controversy here does specifically convey title by the use of the following language in paragraph B, noted above, to wit: "And, subject to the royalties hereinafter reserved, all of the oil and gas in and under said land is hereby granted and conveyed to the lessee"; thus coming within the rule of construction announced in Texas Co. v. Daugherty, 107 Tex. 226, 176 S. W. 717, L. R. A. 1917 F. 989, and many other decisions following that one.

[2] It is also well settled that the conveyance to the lessee was upon conditions subsequent, and therefore terminable, unless those conditions were complied with; the compliance with which, however, was optional with the lessee.

It will be observed, and in their briefs counsel for appellants admit, that no definite time is unconditionally fixed in the lease for its termination. However, it is insisted by appellants that, when properly construed, the five-year period immediately following the date of the lease, which was fixed for the payment of rentals, was also the period fixed within which oil in paying quantities must be discovered in order to extend the lease beyond that period; and that the lease did expire at the end of that period, because, as claimed by them, oil in paying quantities was not discovered within that period.

[3] While there is no specific stipulation in the lease that, in the absence of a performance of the conditions upon which it was granted, the title conveyed would be "forfeited," yet we do not believe that the ab-

sence of such provision would enable the owners of the land to escape the application of the rule announced by our Supreme Court in Decker v. Kirlicks, 110 Tex. 90, 216 S. W. 385, in the following language:

"If the provision is ambiguous, that alone condemns it as a forfeiture provision. A forfeiture should rest upon surer ground. Where a contract is so vague in its terms that a court cannot determine its meaning, it would be unjust to enforce a forfeiture under it against one whose only fault has been to possibly mistake its meaning. Forfeitures are harsh and punitive in their operation. They are not favored by the law, and ought not to be. The authority to forfeit a vested right or estate should not rest in provisions whose meaning is uncertain and obscure. It should be found only in language which is plain and clear—whose unequivocal character may render its exercise fair and rightful."

[4] That time is of the essence of a mineral lease, such as for oil and gas, seems to be recognized by all the authorities. Especially is that true when the lease is not upon a covenant to be performed by the lessee, but merely upon a condition, the performance of which is entirely optional with the lessee. That being true, if the lease was terminated, then necessarily the lessee's title was forfeited, since, as said by Justice Gaines in Eakin v. Scott, 70 Tex. 442, 7 S. W. 777, "the primary use of the word forfeit is to lose, and this is also its legal meaning. To forfeit a sum of money means to lose the right to it in favor of another party." To the same effect is 2 Wilson on Contracts, par. 769; Heard v. Nichols (Tex. Com. App.) 293 S. W. 805.

[5] It will be noted that in paragraph C it is provided that:

"If operations for the drilling of an oil or gas well are not begun on said land on or before the 10th day of March, 1923, this lease shall then terminate as to both parties unless the lessee on or before said date shall pay or tender to the lessor or to the credit of the lessor * * * the sum of $161.00."

Then follows provisions that, "in the absence of drilling operations," the lease may be kept in force for each successive period of six months by the payment of the same amount as rentals for a period of four years from the date of the first extension, which means five years from the date of the lease. The substance of those provisions is that, in the absence of drilling operations, the lease may be kept alive for a period of five years from its date by payment of rentals. That limitation of time has reference only to the payment of rentals, in the absence of a beginning of drilling operations. Neither in paragraph C nor in any paragraph of the lease is there any period of time fixed for the termination of the lease, if drilling operations should begin within the five-year period next ensuing from the date of the lease. This is clear from the language used in fixing the period for the termination of the lease and reading as follows:

"But in the absence of drilling operations this lease cannot be kept in force by such payments or tenders for a total period longer than four years from the date of the first extension."

It is clear from other provisions in the lease that it was understood by the parties that, when drilling operations were once begun, the same should be prosecuted with diligence to completion. Among others, is the provision in paragraph E that, in the event a well should be drilled on adjoining territory within 200 feet of the land in controversy producing 50 barrels of oil a day, during the period of any extension of the lease and prior to the discovery of oil and gas on the land in controversy, then the lessee "with reasonable diligence will begin and prosecute the drilling of a well on the leased land in a faithful effort to reach the stratum and produce oil on the leased land." Clearly, if a well was begun within the requirements of the provisions of paragraph E, the lessee would have a reasonable time to finish it by prosecuting the work with reasonable diligence and in a faithful effort to produce oil. The obligations and rights so provided in paragraph E show without doubt that the five-year period of limitation provided in paragraph C did not apply, if drilling operations were begun within the five-year period. The same understanding and intention of the parties to the instrument is indicated by the provision in paragraph E, to the effect that, when drilling operations once begun are interrupted by causes beyond the control of the lessee, the time of duration shall not be counted against him, "anything in this lease to the contrary notwithstanding."

It is to be noted further that in paragraph F it is provided that a discovery of oil in paying quantities will operate to continue the lease "in full force and effect for ten years from such discovery, and as much longer as oil and gas is produced in paying quantities. * * *" In that paragraph no period of time is fixed within which such discovery of oil is to be made; it is not conditioned upon such discovery being made within the five-year period mentioned above, and those provisions furnish further evidence of an understanding between the parties that, if drilling operations should begin within the five-year period, then the lessee would have a reasonable time within which to finish the well.

As stated above, the rentals were paid for the full five-year period, and the well was begun about three weeks prior to the termination of that period, and was prosecuted with success; oil in paying quantities having been produced. No contention was presented in the trial court and none here that the drilling was not prosecuted with due diligence. Under the undisputed facts, we conclude that it was the duty of the trial court to instruct

a verdict in favor of defendant, independently of the further question whether or not oil in paying quantities was discovered prior to the expiration of the five-year period following the date of the execution of the lease.

[6, 7] Even though a greater quantity of oil had been actually discovered on March 10th at the time drilling was finished and it was decided to set casing, the question whether or not the well would thereafter produce oil in paying quantities was then necessarily problematic, and the question could not be determined with certainty until after the well was operated for production; oil later produced, of course, not then being in sight. And the right to determine that question, according to the well-settled rule of decisions, was the privilege of the lessee, since it had taken all the risk and incurred all the expenses of drilling operations. Summers on Oil & Gas, pp. 320 and 321, and many decisions there cited, including Masterson v. Amarillo Oil Co. (Tex. Civ. App.) 253 S. W. 908; T. P. C. & O. Co. v. Bruce (Tex. Civ. App.) 233 S. W. 535. And the parties to the instrument must have employed the terms "discover oil in paying quantities" with the understanding and intention that such was their legal import, since any other construction would be unreasonable. That would be true, even though the rule of strict construction should be applied as against the lessee rather than the lessors, against whom it is properly applicable, for the rule of strict construction is always subordinate to the primary rule of reasonable construction.

[8] The setting of casing and drilling out of the core of cement therefrom after hardening, and swabbing in order to remove the mud that had accumulated in the well, like the installation of a pump, were merely steps necessary for the operation of the well for production. Without further drilling, oil in paying quantities was produced from the source indicated by the presence of the oil discovered on March 10th, which was the last day of the five-year period next following the date of the lease; and, independently of the quantity then brought to view, the finding of it constituted the discovery of oil in paying quantities on March 10th, within the meaning of the language of the lease. Since the facts just recited were established without controversy, the action of the trial court in instructing a verdict for the defendant was proper, even though it should be held that, by reason of any of the provisions of the lease, discovery of oil in paying quantities within the five-year period was a necessary condition to an extension of the lease beyond that period.

[9, 10] The evidence shows that the lease was prepared by the lessee, and, when first presented to the lessors for their signatures, the provision in paragraph C, fixing four years from the date of the first extension as a limit of time for extension by payment of rentals alone, had the time so fixed at five years instead of four years, and the same was changed to four years at the instance of the lessors. Appellants stress those facts in support of their contention that the terms of the lease should be strictly construed as against the lessee and in favor of lessors.

In the first place, those circumstances could not be given any weight, unless the terms of the contract with respect to the questions discussed above were ambiguous. If ambiguous, that fact would of itself condemn them as a ground for forfeiture or termination of the lease under the rule announced in the decision of Decker v. Kirlicks, supra. Secondly, if there be such ambiguity, that fact would furnish no reason for applying the rule of strict construction against the lessee rather than against the lessors, under the same rule of decisions. Lastly, there is no ambiguity in the terms of the lease, and therefore the application of the rule invoked could not have any bearing upon our foregoing conclusions.

For the reasons indicated, all assignments of error are overruled, and the judgment of the trial court is affirmed.

## On Motion for Rehearing.

[11] In the usual lease for oil and gas a definite period of time is fixed for the exploration of the land by the lessee for the purpose of determining whether or not it contains oil or gas in sufficient quantities for profitable production. Since that period is for exploration only, it follows necessarily that production of oil or gas within that period is not required of the lessee. The primary meaning of the word "discover" does not include production, it merely means to find; and necessarily that is the meaning of the term when used in connection with exploratory operations, since such operations are designed solely for the purpose of determining whether or not the land contains oil or gas in sufficient quantities for profitable production. Following the provisions for the exploration of the land, the lease usually contains the stipulation to the effect that, if during the exploratory period oil or gas is found or discovered in paying quantities "thereafter," the lease shall continue in full force and effect as long as oil or gas is "found" or "produced" in paying quantities. Those provisions relate to production only, and not to exploratory operations; and necessarily such stipulations, to the effect that, when oil or gas is found in paying quantities as the result of exploratory operations, and within the fixed time for such operations, then the lease shall continue "thereafter" as long as oil or gas is found or discovered in paying quantities, necessarily means as long as oil and gas is "produced" in paying quantities, since production is then the only object within the contemplation of the parties.

Appellant has cited Union Gas & Oil Co. v. Adkins (C. C. A.) 278 F. 854. In that case the lease was for "three years or as long as gas or oil is found in paying quantities on said premises." It was held that the failure of the lessee to complete a well producing oil in paying quantities within the three-year period terminated the lease. That case is clearly distinguishable from the present suit by reason of the further provision contained in the lease that "in case no paying well is drilled on said premises within three years from date, this grant shall be null and void." That provision in specific terms required the lessee to complete a well producing oil in paying quantities within the fixed period. The opinion in that case cites in support of its conclusion the following decisions: Murdock-West Co. v. Logan, 69 Ohio St. 514, 69 N. E. 984; Deltor v. Holland, 57 Ohio St. 492, 49 N. E. 690, 40 L. R. A. 266; Gas Co. v. Tiffin, 59 Ohio St. 420, 54 N. E. 77; Cassell v. Crothers, 193 Pa. 359, 44 A. 446. And in Summers Oil & Gas, p. 293, also cited by appellant, those decisions are cited as holding that the words "found" and "discovered" in paying quantities mean the same as "obtained" and "produced" in such quantities.

In Murdock-West Co. v. Logan, supra, the lease provided that it should run "for and during the term of 60 days from the date thereof 'and as much longer thereafter as oil or gas shall be found in paying quantities.'" By agreement of the parties the term was extended for an additional 60 days. The court has this to say:

"In order to continue their lease beyond the stipulated time it was necessary for the lessees to find oil in paying quantities. For this purpose it was not sufficient to complete a well having some indications of oil, or a well which might be developed into a well producing oil in paying quantities, but the lessees must actually find oil in paying quantities and this is the same as obtaining and producing it in paying quantities."

It was further held that the failure to complete a well producing oil in paying quantities within the fixed term resulted in a termination of the lease.

In the other decisions cited from Ohio and also in Cassell v. Crothers, 193 Pa. 359, 44 A. 446, the leases were in terms substantially in the same form as that involved in Murdock-West Co. v. Logan, supra.

It is to be noted that in the leases involved in those decisions there is an absence of any provision to the effect that, "if oil or gas in paying quantities is found or discovered" during the fixed period, then the lease should continue thereafter as long as oil or gas in paying quantities is produced. Apparently the conclusion reached was based upon the theory that necessarily there must be a producing well on the land at the expiration of the fixed period in order for the lease to continue "thereafter as long as oil or gas is produced in paying quantities," and that therefore the stipulation that oil must be produced in paying quantities during the fixed period is necessarily implied, since the extension period, if effective, began immediately upon expiration of the fixed period, and since the requirement that, as a condition necessary to the life of such extension, oil must be produced in paying quantities was applicable at the beginning of the extension period as well as thereafter.

However, the terms of the lease may be such as to negative the implied provision mentioned above, and we believe that such is the result when the condition for the extension of the lease beyond the fixed period is expressed as the "discovery" or the "finding" of oil in paying quantities during the term fixed for exploration and not for production of oil in such quantities during the term. Indeed, the lease in this suit showed on its face that the fixed term was for the purpose of testing the land for oil and gas. That could not be said of the leases involved in the cited cases from Ohio and Pennsylvania.

In the recent work of Mills and Willingham on the Law of Oil and Gas, p. 119, par. 73, the holding of the Supreme Court of Ohio in Murdock-West Co. v. Logan is noted. Then follows paragraph 74 on the same page, which reads as follows:

"The states of Oklahoma and West Virginia, however, seem definitely committed to the rule that the discovery of oil or gas although neither is produced during the term, vests in the lessee a right to proceed with operations for the production of those minerals as long as they are capable of being produced; provided he exercises diligence in continuing operations until the oil or gas discovered is produced. This result is reached whether the lease requires that oil or gas be found, or produced, during the term. It is predicated upon the doctrine that a lessee has no estate, under an oil and gas lease, until oil or gas be discovered, in which event his right to produce from the premises becomes vested for further operations under the terms of the lease, and is based upon the case of Eastern Oil Co. v. Coulehan [65 W. Va. 531, 64 S. E. 836].

"Accordingly, it has been held that the discovery of oil or gas in an upper sand, during the term, although neither was actually produced, and operations were continued with the intent of returning and producing from such stratum, in case no further production was discovered at a lower level, vested in the lessee the right to produce from a sand discovered after the expiration of the term."

Numerous decisions of the Supreme Court of Oklahoma and West Virginia are cited by the author in support of what is stated in the text, including the leading case of Eastern Oil Co. v. Coulehan, 65 W. Va. 531, 64 S. E. 836; also South Penn Oil Co. v. Snodgrass, 71 W. Va. 438, 76 S. E. 961, 43 L. R. A. (N. S.) 848; Ohio Fuel Co. v. Greenleaf, 84 W. Va. 67, 99 S. E. 274; Roach v. Junction Oil

& Gas Co., 72 Okl. 213, 179 P. 934; Hennessy v. Junction Oil & Gas Co., 75 Okl. 220, 182 P. 666; Parks v. Sinai Oil & Gas Co., 83 Okl. 295, 201 P. 517, 5 O. & G. 52; Strange v. Hicks, 78 Okl. 1, 188 P. 347. To the same effect was the decision of this court in the case of T. P. C. & O. Co. v. Bratton, 239 S. W. 688, which is also cited by the author. And it is our conclusion that that rule of decision is logically sound, and should be followed.

Motion for rehearing is overruled.