221 F.2d 124
 CONTINENTAL OIL COMPANY and Sunray Oil Corporation, on behalf of themselves and the class represented by them, and Joe A. Keith and P. C. Keith, Intervenors, Appellants,
v.
BOSTON-TEXAS LAND TRUST, Appellee.
 No. 14974.
 United States Court of Appeals, Fifth Circuit.
 March 30, 1955.
 
 William E. York, McAllen, Tex., and Orville I. Cox, McAllen, Tex., Ward T. Jones, Houston, Tex., A. W. Walker, Jr., Dallas, Tex., for appellants.
 Carmel F. Davis, Alice, Tex., Perkins, Floyd & Davis, Alice, Tex., for appellee.
 Before BORAH, RIVES and TUTTLE, Circuit Judges.
 RIVES, Circuit Judge.
 
 
 1
 The matter to be decided in this cause is the subsistence vel non of an oil, gas and mineral lease.
 
 
 2
 Boston-Texas Land Trust was the owner of all the minerals in and under 22,469.4 acres of land, more or less, in Hidalgo and Starr Counties, Texas. On July 26, 1946, it conveyed by warranty deed to one Lloyd M. Bentsen one-half of all the oil, gas and other minerals in and under said land, together with the exclusive right and privilege to the grantee and his assigns during the term of the grant to execute leases for oil, gas and other minerals covering both the half interest conveyed and the half interest retained by the grantor. The primary term of the grant was to expire five (5) years after August 6, 1946, subject to certain provisions as to production of minerals on said land copied in the margin.[1]
 
 
 3
 On August 1, 1946, Bentsen executed the lease in controversy to T. C. Huddle. By mesne conveyances the title to the lease, subject to a 1/16th reservation by Huddle, passed to Sunray and Continental. The additional parties are royalty owners and others claiming under the parties heretofore mentioned. On August 13, 1946, the grantor in the deed, Boston-Texas Land Trust ratified, confirmed, adopted and approved the lease. The five-year primary term of the lease was coextensive with the five-year period of the deed. It contained provisions as to discovery of oil or gas on the land, and its provisions as to the production thereof were somewhat different from those contained in the deed, footnote (1), supra. The pertinent provisions of the lease are set forth in the margin.[2]
 
 
 4
 Continental and Sunray instituted the suit seeking a declaratory judgment that the lease had not terminated. Boston-Texas filed a counterclaim seeking a declaratory judgment that the lease had expired except as to a gas well and 640 acres. All parties moved for summary judgment on the pleadings, the pre-trial stipulations and affidavits. The district court at first denied the motion of the plaintiffs, Continental and Sunray, and granted the motion of the defendant, Boston-Texas, on its counterclaim, but pursuant to motion for rehearing the court ordered a hearing on the evidence on "the question of oil in paying quantities",[3] and, after hearing such evidence, entered judgment[4] for the defendant, Boston-Texas, on its counterclaim that the lease had expired.
 
 
 5
 It is conceded that the lease was maintained in force until the end of its primary term, August 6, 1951. At the beginning of the litigation, the controversy centered about the thirty day clause,[5] but, while the case was pending, the Supreme Court of Texas decided a case in which it construed an identical clause in such a way that the plaintiffs, Continental and Sunray, would have no further rights thereunder.[6] The main contention then shifted to the sixty day clause.[7]
 
 
 6
 The district court found that the first well, L. M. Bentsen No. 1, was completed as an oil well December 4, 1947, produced in paying quantities at the time, but thereafter ceased to produce in paying quantities, and was finally abandoned in May, 1949. In addition to the Bentsen No. 1 well, appellants completed four dry holes and one shut-in gas well.[8] This shut-in gas well, L. M. Bentsen No. 2, was completed on September 14, 1948. L. M. Bentsen No. 3 was spudded in on October 21, 1948, and completed as a dry hole November 20, 1948. A fourth well, L. M. Bentsen No. A.1, was commenced on August 15, 1950 and completed as a dry hole on September 17, 1950. A fifth well, L. M. Bentsen No. 4, was commenced on March 23, 1951, and completed as a dry hole on May 19, 1951. The district court found that, "The sixth and final well (L. M. Bentsen No. B.1) was commenced July 25, 1951, and was completed, to all intents and purposes, as a dry hole on August 6, 1951, the termination date of the lease."
 
 
 7
 Viewing the situation as of the date of the completion of the third well, L. M. Bentsen No. 3, as a dry hole on November 20, 1948, the district court said:
 
 
 8
 "If at that time, the first well (L. M. Bentsen No. 1) was a dry hole or a discovery from which production had ceased, the lessee had two methods of keeping the lease alive: (1) commencement of additional drilling or reworking operations within 60 days; or (2) resumption of payment of delay rentals on or before September 1, 1949, which was the next ensuing rental paying date after the expiration of three months from the date of completion of the last dry hole or cessation of production. In any event, when the first well ceased to produce at all in May, 1949, lessee had the same choice, that is, additional drilling within 60 days, or resumption of rentals on or before September 1, 1949. Continental chose the latter course and defendant accepted the rentals, which deferred commencement of another well to September 1, 1950."
 
 
 9
 The fourth well was commenced on August 15, 1950, prior to the September 1st date, but more than 60 days after the first well had ceased to produce. The district court held that the fourth, fifth, and sixth wells "were not drilled `prior to discovery', so the dry hole clause has no application."
 
 
 10
 The main thrust of appellants' argument is directed at the finding of the district court that the Bentsen No. 1 well constituted a discovery within the meaning of the sixty-day clause of the lease, footnote 7, supra. It is obvious that "discovery" and "production" are not synonymous. Morrison v. Swaim, Tex.Civ.App., 220 S.W.2d 493, 494. "The primary meaning of the word `discover' does not include production, it merely means to find; * * *." Bouldin v. Gulf Production Company, Tex.Civ.App., 5 S.W.2d 1019, 1023. See also Rogers v. Osborn, 152 Tex. 540, 261 S.W.2d 311, 313; Upshur County v. Heydrick, Tex.Civ.App., 221 S.W.2d 326, 329.
 
 
 11
 While not expressly so stated in the sixty-day clause of the lease, the production or discovery of oil or gas therein referred to means production or discovery in paying quantities. Rogers v. Osborn, supra; Garcia v. King, 139 Tex. 578, 164 S.W.2d 509; Stanolind Oil & Gas Co. v. Barnhill, Tex.Civ.App., 107 S.W.2d 746. After hearing the evidence, the district court found:
 
 
 12
 "I think, however, and so find, that there was both discovery and production in paying quantities in the first well in December, 1947. The general test of production in paying quantities is whether it is reasonably possible to market or use gas producible at date of completion of the well and immediately thereafter with some pecuniary profit, excluding from consideration expenses and liabilities incurred in bringing the well to completion.[15] While the profit was small, I think unquestionably all parties regarded the well as a producer in paying quantities at the time. Thereafter it ceased to produce in paying quantities bringing into play the second contingency of the 60-day clause. * * *
 
 
 13
 "[15] Stephenson v. Little, (Tex. Com.App.), 12 S.W.2d 196."
 
 
 14
 As heretofore stated, this finding was made after full opportunity to all parties to introduce evidence on whether oil in paying quantities was discovered or produced. It should not, therefore, be set aside or disregarded by this Court unless we find it to be clearly erroneous. To the contrary we are in full agreement with such finding.[9] One of the experts testified: "Your Honor, it is a discovery well whether it produces thirty days or thirty years. The Court: You mean in the industry? The Witness: Yes, sir." We do not deem it necessary to restate more fully the evidence on this issue. The judgment is
 
 
 15
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 "It is further agreed and stipulated herein that in case there is no production on said land in five (5) years after August 6, 1946 then (except in the conditions hereinafter provided), this grant shall become null and void, and the minerals hereby conveyed shall revert to the Grantor herein, their successors and assigns, but should there be such production, then in that event this grant shall remain in full force and effect until such production ceases after which this instrument shall become null and void; however, if at the expiration of said period of time above set out, a mineral is not being produced on said premises but drilling operations, reworking operations or mining operations are being engaged thereon, this instrument shall remain in full force and effect so long as said drilling, reworking or mining operations, whether on the same well or mine or on different wells or mines successively, are continuously prosecuted, and, if they result in the production of a mineral, then this grant shall remain in full force and effect so long thereafter as any mineral is produced hereunder. A lapse of not more than sixty (60) days between the completion of drilling operations or reworking operations on one well, and the commencement of drilling operations or reworking operations on another well shall not be deemed an interruption of continuous prosecution. Further, commencement of drilling, reworking or mining operations, after production of a mineral has been established, if commenced within sixty (60) days after the termination of production, shall have the same force and effect as if commenced prior to August 6, 1951, and then in that event, this grant will continue in full force and effect during such operations and during continuation of any production established thereby
 "It is further understood and stipulated herein, that no payments for a shut-in gas well in lieu of gas royalty shall be deemed production or hold any acreage hereunder in excess of 640 acres, including the acreage on which said gas well is located in as nearly the form of a square of which said shut-in gas well shall be in the center as the boundaries of the land covered hereby shall permit."
 
 
 [2]
 "2. Subject to the other provisions herein contained, this lease shall be for a term offive (5) years and 5 days from this date (called `primary term') and as long thereafter as oil, gas or other mineral is produced from said land hereunder.
 * * * * *
 "5. If prior to discovery of oil or gas on said land Lessee should drill a dry hole or holes thereon, or if after discovery of oil or gas the production thereof should cease from any cause, this lease shall not terminate if lessee commences additional drilling or re-working operations within sixty (60) days thereafter or (if it be within the primary term) commences or resumes the payment or tender of rentals on or before the rental paying date next ensuing after the expiration of three months from date of completion of dry hole or cessation of production. * * *
 * * * * *
 "10. It is further understood and stipulated herein that payments for gas from a well or wells producing gas only, where the same is not sold or used as provided for in Paragraph 3 above, shall be deemed production and shall hold the lease in full force and effect as to 640 acres only for each well, which acreage is to include said gas well. The exact form of the acreage affected by each said gas well is to be determined by the lessee but is to be as near as possible in the form of a square as the boundaries of the land covered by the lease and location of the well or wells may permit and with each said well located as near the center of said 640 acres as possible." (Paragraph 10 was a typewritten addition to a printed form.)
 
 
 [3]
 "As held in the original memorandum, the court considered the question of oil in paying quantities to be material. The parties reserved the right to offer evidence on the question but I assumed the Peck affidavit covered all the facts. Since the Court of Appeals for this Circuit repeatedly has enjoined trial judges to permit all the facts to be developed before acting on motions for summary judgment, and it is desirable that they should have the benefit of full findings on appeal, I will hear any further evidence the parties may care to offer on this issue at Corpus Christi, on July 15, 1953, at 2:00 P.M."
 
 
 [4]
 Though all parties had been given the opportunity to produce evidence on the critical issue, the judgment recites:
 "It is further ordered, adjudged and decreed that the motion of the Defendant, Boston-Texas Land Trust, for summary judgment against Plaintiffs, the class represented by them, and the Intervenors, be and the same is hereby granted, and it is hereby adjudged and declared:"
 
 
 [5]
 "If at the expiration of the primary term oil, gas or other mineral is not being produced on said land but lessee is then engaged in drilling or re-working operations thereon, this lease shall remain in force so long as operations are prosecuted with no cessation of more than thirty (30) consecutive days, and if they result in the production of oil, gas or other mineral so long thereafter as oil, gas or other mineral is produced from said land."
 
 
 [6]
 In Rogers v. Osborn, 152 Tex. 540, 261 S.W.2d 311, 315, decided April 29, 1953, rehearing denied Oct. 28, 1953, the Texas Supreme Court said of the thirty day clause:
 "This sentence means that if production results from the continuous prosecution of the very operations being engaged in by the lessees upon the expiration of the primary term, the lease is good. This is not to be confused with the lessees' rights to drill additional wells under the `dry hole' and `if production ceases' sentence."
 The district court stated: "* * * under the decision in Rogers v. Osborn, plaintiffs have no rights under the 30-day clause since the well (L. M. Bentsen No. B-1) being drilled, and, to all intents and purposes, completed on August 6, 1951, (the termination of the date of the lease) was dry."
 
 
 [7]
 "If prior to discovery of oil or gas on said land Lessee should drill a dry hole or holes thereon, or if after discovery of oil or gas the production thereof should cease from any cause, this lease shall not terminate if lessee commences additional drilling or re-working operations within sixty (60) days thereafter or (if it be within the primary term) commences or resumes the payment or tender of rentals on or before the rental paying date next ensuing after the expiration of three months from date of completion of dry hole or cessation of production."
 
 
 [8]
 It is conceded that under the typewritten paragraph 10 of the lease, quoted in footnote (2), supra, shut-in payments held the lease in force as to 640 acres. The district court held that the shut-in gas well did not otherwise affect the controversy. Appellee insists that that well was also a "discovery" within the meaning of the sixty-day clause of the lease. We do not find it necessary to decide that question
 
 
 [9]
 The details are thus stated in appellee's brief:
 "The well was completed, according to the reports filed by the operator with the Railroad Commission, and according to the testimony of Appellants' witness, Mr. Stanberry, on December 3, 1951, the well produced 225 barrels of oil on the 24-hour potential test from the afternoon of December 3rd to the afternoon of December 4th, sold for $2.73-1/20 per barrel, or a total of $615.61. After deducting the 1/8th royalty of $76.95, there remains an income to the operator of $538.66, which exceeds the total cost for the full month of December of $528.51, less shut-down rig time of $412.65, by $422.80. In other words, the operators, from the one day's production, realized $422.80 profit over and above all production and marketing costs for the full month. It will be noted that production of oil continued from the Bentsen No. 1 well when it was reopened during the first part of January, 1948. Under Appellants' original figures submitted by Mr. Peck, Chief Clerk for the Production Accounting Division of Continental Oil Company, the lease expense, exclusive of drilling cost and depreciation, amounted in January to $143.07, which was much less, even if you add on the depreciation later supplied, than the value of the oil produced during the first six days of the month. It is quite obvious that in Mr. Peck's later figures, he included drilling costs, calling it testing and remedial expense, but it is the same thing, regardless of what he later chose to call it, and as a drilling cost, should not be used in determining whether or not the well produced in paying quantities, if that be material. There is also included in the total operating cost under Mr. Peck's last figures, production taxes, even though the production taxes had already been deducted in arriving at the value of the oil and gas sold. At least that was true for the month of December, and presumably, the records for all months shown by his statement were kept in the same manner."